1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10
11

RUDY GONZALEZ, on behalf of himself and all others similarly situated,

12

                    Plaintiff,

13

          v.

14

XTREME MANUFACTURING, LLC, et al.,

15

                    Defendants.

16

Case No.: 1:20-cv-01704 JLT SKO

ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

(Doc. 29)

17          Rudy Gonzalez asserts Xtreme Manufacturing, LLC, failed to comply with California's wage

18   and hour laws as provided in the California Labor Code, Fair Labor Standards Act, and the Business

19   and Professions Code.  (*See generally* Doc. 9.)  Gonzalez now seeks preliminary approval of a class

20   settlement reached in this action.  Specifically, Gonzalez seeks: (1) conditional certification of the

21   settlement class; (2) preliminary approval of the settlement terms, including a PAGA payment; (3)

22   appointment as the class representative; (4) appointment of the firm of Mayall Hurley P.C., by and

23   through lead counsel Robert Wasserman and Jenny Baysinger, as class counsel; (5) approval of the

24   class notice; (6) appointment of Simpluris, Inc., as the settlement administrator; and (7) scheduling for

25   final approval.  (Doc. 29.)

26          The Court reviewed the proposed settlement between the parties and proposed class notice, as

27   well as the moving papers.  For the following reasons, the motion for preliminary approval of the class

28   settlement is **GRANTED**.

## BACKGROUND

Gonzalez reports he was employed by Xtreme as a machinist in the company's facility located in Selma, California, beginning in April 2019.  (Doc. 9 at 3, ¶ 8.)  Gonzalez asserts that he was classified as a non-exempt employee, and as a result "was entitled to be paid for every hour worked and overtime as appropriate."  (*Id.*, ¶ 9.)  However, Gonzalez alleges that "Xtreme failed to pay Gonzalez and its other non-exempt employees for all hours they worked."  (*Id.*, ¶ 10.)

According to Gonzalez, Xtreme had "issues with… timekeeping, including an inconsistent and unfair rounding policy."  (Doc. 9 at 3, ¶ 11.)  Gonzalez contends that with the rounding policy, "[he] and Xtreme's other non-exempt employees were routinely credited for less hours than they actually worked."  (*Id.*)  He asserts, "Xtreme would regularly round his time punch entries in [the company's] favor."  (*Id.*, ¶ 12.)  For example, Gonzalez alleges that "if [he] clocked in at 6:24 for a 6:30 shift, his time would be rounded to 6:30, but if he clocked out at 3:10, his clock out time would be rounded down to 3:00 p.m."  (*Id.*)

Gonzalez asserts that "Xtreme routinely and knowingly edited its employees' time punches to reflect less hours than they actually worked and paid them only according to the altered records." (Doc. 9 at 4, ¶ 13.)  He contends, "There were numerous occasions that Gonzalez's managers/supervisors would physically alter his time punches in order to reduce the time worked and reflect less hours than he actually spent working." (*Id.*, ¶ 14.)  He alleges:

> By way of specific example, Gonzalez's time punch records for the period of September 26, 2019 and October 2, 2019 reflect edits to his time entries on each and every day. Those edits were made by Xtreme's managers/ supervisors to reduce the number of hours recorded and thereby the wages paid to Gonzalez.

(*Id.*, ¶ 15.)  Gonzalez alleges that "[s]ome of the altered was overtime that should have been paid at overtime premium wages under the FLSA and/or California Labor Code."  (*Id.*, ¶ 16.)

Gonzalez alleges Xtreme also violated California law by failing to provide proper meal and rest breaks.  (Doc. 9 at 4, ¶ 17.)  He asserts, "Xtreme required Gonzalez and its other non-exempt employees to work through meal and rest breaks due to understaffing and work demands."  (*Id.*, ¶ 18.) Gonzalez contends he and other non-exempt employees were frequently not relieved of Xtreme's control during meal and rest breaks.  (*Id.*)  He alleges that when he and other employees were able to

take meal breaks, "they routinely occurred after 5 hours of work." (*Id.*) Gonzalez contends Xtreme "knowingly and intentionally edited Gonzalez and its other non-exempt employees' time punches to reflect meal periods that did not actually occur or did not occur as reported in the altered time records." (*Id.*, ¶ 20.) He asserts the alterations to time punches "further reduc[ed] the amount of work time Gonzalez was paid for (i.e. because meals were inserted that were not taken, Gonzalez's time worked was artificially reduced by thirty minutes and wages for that time were not paid)." (*Id.*, ¶ 15.) Gonzalez alleges Xtreme did not pay the premiums required under California law for the failure to provide compliant and mal breaks. (*Id.*, ¶ 22.)

Gonzalez alleges Xtreme "intentionally and willfully failed to reimburse [Gonzalez] and its other non-exempt employees for all necessary expenditures or losses incurred in the direct consequence of the discharge of their job duties in violation of Labor Code section 2802." (Doc. 9 at 5, ¶ 23.) For example, he asserts that Xtreme charged employees for their uniforms. (*Id.*)

According to Gonzalez, Xtreme failed to provide accurate wage statements to the non-exempt employees as a result of the alleged violations of California labor law. (Doc. 9 at 5, ¶ 24.) He contends the wage statements did not accurately identify the gross wages earned, total hours worked, net wages earned, and "[a]ll applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate." (*Id.*) Finally, Gonzalez contends the non-exempt employees "are not timely paid all wages due and owing to them each pay period and at the end of their employment. " (*Id.*, ¶ 25.)

In his First Amended Complaint, Gonzalez identified the following causes of action: (1) failure to pay minimum wage, (2) failure to pay overtime, (3) failure to provide meal periods, (4) failure to provide rest periods, (5) failure to reimburse for all business expenses, (6) failure to pay all wages due and owing at the end of employment, (7) failure to provide accurate itemized wage statements, (8) unlawful business practices, (9) civil penalties pursuant to California's Private Attorney General Act, (10) failure to timely provide payroll records, and (11) failure to timely provide personnel records. (Doc. 9 at 1, 9-19.) Gonzalez asserted the First through Eighth Causes of Action were brought "on behalf of himself and all others similarly situated," with narrowed subclasses defined to address the alleged violations. (*See id.* at 6.) Xtreme filed its Answer on March 15, 2021. (Doc. 10.)

1    The Court issued its Scheduling Order governing the action—including any briefing on a

2    motion for class certification—on April 16, 2021.  (Doc. 14.)  The parties engaged in discovery,

3    including both informal information exchanges and propounding written discovery requests.  (Doc.

4    29-1 at 9.)  Gonzalez reports that Xtreme produced "critical numerical information, hundreds of pages

5    of policy documents, and comprehensive time and payroll records for 205 Class Members from

6    December 5, 2016 through October 28, 2021."  (*Id.*; *see also* Doc. 29-2 at 3-4, Baysinger Decl. ¶¶ 13-

7    14.)  This produced discovery included "more than 400,000 line items of payroll and time data (each

8    line consisting of multiple data points) relating to [the] putative Class Members."  (*Id.* at 4, ¶ 14.) In

9    addition, counsel "retained a qualified and experienced expert to analyze the data and create a

10   damages model for use during the mediation."  (*Id.* at 4, ¶ 15.)

11       On December 23, 2021, the parties participated in a mediation session with Lou Marlin, Esq.

12   (Doc. 29-1 at 10.)  The mediation session was terminated due to a health emergency, and the parties

13   agreed to resume on February 22, 2022.  (*Id.*)  However, the parties "engaged in numerous substantive

14   discussions—both directly and with the assistance of Mr. Marlin—in the intervening two [] months."

15   (*Id.*)  As a result of the continued discussions, the parties reached an agreement to resolve the matter in

16   principle prior to the scheduled mediation date.  (*Id.*)  The parties executed the "Joint Stipulation of

17   Class and Representative Action Settlement Agreement" in June 2022.  (Doc. 29-2 at 21-42.)  Gonzalez

18   now seeks approval of the Settlement Agreement.  (Doc. 29.)  Xtreme did not oppose or otherwise

19   respond to the motion.

20   ## THE PROPOSED SETTLEMENT

21       Pursuant to the "Joint Stipulation of Class and Representative Action Settlement Agreement"

22   ("the Settlement"), the parties agree to a gross settlement amount of $290,000.00 for the class defined

23   as follows: "all current and former non-exempt California employees of Xtreme who worked at least

24   one shift from December 4, 2016 to March 1, 2022."  (Doc. 29-2 at 22-23, ¶¶ 3, 17.)  In addition, the

25   Settlement includes an "escalator clause," under which the gross settlement amount will be increased

26   if the number of Class Members increases by more than 10% over the 219 members estimated at the

27   time of execution or if the verified number of workweeks for the class members increases by more

28   than 5% over the estimated 19,679 workweeks included in the class period.  (Doc. 29-2 at 26,

Settlement ¶ 44; *see also* Doc. 29-1 at 8.)  Defendant agrees to pay the gross settlement amount to the

Settlement Administrator after final approval of the Settlement.  (*Id.* at 36, Settlement ¶ 56.)

## I.    Payment Terms

The gross settlement fund will cover payments to class members with additional compensation

to Gonzalez as the class representative.  (Doc. 29-2 at 26-28, Settlement ¶¶ 45-46.)  In addition, the

Settlement provides for payments to Class Counsel for attorneys' fees and expenses, to the Settlement

Administrator, and the California Labor & Workforce Development Agency.  (*Id.*)  Specifically, the

Settlement provides for the following payments from the gross settlement amount:

- The Class Representative will receive an incentive award up to $5,000;

- Class counsel will receive up to $96,666.67 for attorneys' fees, which equals 33 1/3 % of the gross settlement, and litigation expenses up to $14,000;

- The California Labor and Workforce Development Agency shall receive $7,500 from the total PAGA payment of $10,000; and

- The Settlement Administrator will receive up to $5,500 for fees and expenses.

(*Id.* at 26-27, Settlement ¶ 45.)  After these payments, the remaining money ("Net Settlement Amount")

— which is currently estimated to be $158,888.33— will be distributed to class members.  (*Id.* at 28,

Settlement ¶ 46.)  If the Court approves payments from the fund that are less than the amounts

designated above for the class representative, attorneys, the LWDA, or the Settlement Administrator,

the remainder will be "retain[ed] … in the Net Settlement Amount for distribution to Class Members."

(*Id.* at 27, Settlement ¶ 45(e).)

Class members are not required to submit a claim to receive a share from the Net Settlement

Amount.  (Doc. 29-2 at 26, Settlement ¶ 43; *see also* Doc. 29-1 at 11.)  Class members' shares will be

distributed on a pro rata basis, "based upon the number of workweeks worked by Participating Class

Members during the Class Period."  (Doc. 29-2 at 11.)  Specifically, the Settlement provides:

> Payments will be paid from the Net Settlement Amount and paid pursuant to the formula as follows: (i) First, using the Class Data List, the Administrator will compute the total number of workweeks of all Participating Class Members collectively during the Class Period; this sum shall be known as the "Workweek Total;" (ii) Second, the Administrator will divide the Net Settlement Amount by the Workweek Total to determine the settlement value of each eligible Workweek; this shall be known as the "Workweek Value;" (iii) Third, the Administrator

> will multiply the number of Workweeks of a Participating Class
> Member during the Class period by the Workweek Value to determine
> the Participating Class Member's Individual Class Settlement Payment.

(Doc. 29-2 at 28, Settlement ¶ 46(a).)  Thus, the exact amount settlement class members receives

depends upon how many weeks they worked for Xtreme, and whether they are entitled to a portion

allocated for the release of PAGA claims.  However, Gonzalez reports that if the Court were to

approve of the proposed payments from the gross fund—including the maximum attorney fees and

class representative enhancement award under the Settlement—the average settlement share is

expected to be $725.26.  (Doc. 29-1 at 18.)

The appointed Settlement Administrator will distribute payment by mailing checks to all

participating Class Members and Aggrieved Employees.  (Doc. 29-2 at 36, Settlement ¶ 56.)  Checks

must be cashed within 180 days of the mailing.  (*Id.*, Settlement ¶ 57.)  If any check remains uncashed

after the 180-period, the money does not revert to Xtreme.  (*Id.*; *see also id.* at 26, ¶ 43.)  Rather, "the

Administrator will void the checks, and transmit the funds to the State of California's Controller,

Unclaimed Property Division for further handling on behalf of the Class Member."  (*Id.*)

## II.    Releases

The Settlement provides that Plaintiff and class members, other than those who elect not to

participate in the Settlement, release Xtreme[1] from claims arising in the relevant period.  Specifically,

the release for class members provides: "As of Effective Date, the Released Parties shall be entitled to

a full and final accord, satisfaction, settlement, and release of the Released Claims for the Class Period

from Participating Class Members, including Plaintiff."  (Doc. 29-2 at 37, Settlement ¶ 59(a).) The

 "Released Claims" are defined as:

> all causes of action and claims that were alleged in the Action, or predicate
> claims that reasonably could have been alleged based on the facts and legal
> theories asserted in the Action, which includes all claims alleged in the
> PAGA Letter and all causes of action alleged in the First Amended
> Complaint. This includes, but is not limited to, statutory, constitutional,
> contractual or common law claims for wages, damages, unpaid costs or
> expenses, penalties, liquidated damages, punitive damages, interest,
> attorneys' fees, litigation costs, restitution, or equitable relief, arising out of
> or based upon the allegations in the Action, including the California Labor

---

[1] The Settlement defines "Released Parties" as including "Xtreme Manufacturing, LLC and its past, present and/or future, direct and/or indirect, owners, officers, directors, members, managers, employees, agents, representatives, attorneys, insurers, parent companies, subsidiaries, affiliates, successors, and assigns. (Doc. 29-2 at 25, Settlement ¶ 34.)

Code, the Fair Labor Standards Act, the California Industrial Welfare Commission Wage Orders, and the California Business and Professions Code § 17200, et seq.; including, without limitation, the following categories of allegations, to the fullest extent such claims are releasable by law: (a) all claims for failure to pay minimum wages; (b) all claims for failure to pay overtime wages, including all claims for the alleged omission of any kind of remuneration when calculating an employee's regular rate of pay; (c) all claims for failure to provide compliant meal periods and pay related premiums at the regular rate; (d) all claims for failure to provide compliant rest periods and pay related premiums at the regular rate; (e) all claims for failure to reimburse business expenses; (f) all claims for failure to pay timely current wages and associated penalties; (g) all claims for failure to pay final wages; and (h) all claims for failure to provide accurate wages statements.

(*Id.* at 24, Settlement ¶ 33.)  Further, the Settlement provides:  "The Class Members understand and agree that this release includes a good-faith compromise of disputed wage claims. The period of the Released Claims shall extend for the Class Period."  (*Id.*)

For individuals who are "aggrieved employees" under PAGA, the released claims include: "all causes of action and claims that were alleged in the Action, or predicate claims that reasonably could have been alleged based on the facts and legal theories asserted in the Action, that seek civil penalties and other relief available pursuant to the PAGA against the Released Parties."  (Doc. 29-2 at 24, Settlement ¶ 28.)  Even if an aggrieved opts out of the class settlement, "they will still be bound by the PAGA Release," which covers the period from December 1, 2019 to March 1, 2022.  (*Id.* at 23-24, Settlement ¶¶ 26-28.)

The release for Gonzalez encompasses more claims than those identified for Settlement Class Members and the PAGA Members, because he agreed to release any claims that could have arisen during the course of his employment with Xtreme, not just those claims constrained to the facts alleged in this lawsuit.  Specifically, Gonzalez's release provides:

As of the Effective Date, Plaintiff hereby fully and finally releases Defendant and the Released Parties from any and all claims, losses, debts, charges, damages, demands, obligations, causes of action, lawsuits, liabilities, breaches of duty, misfeasance, malfeasance, promises, controversies, contracts, judgments, awards, penalties, costs, and expenses of every nature and description whatsoever, known or unknown, asserted or that might have been asserted, whether in tort, contract, or for violation of any local, state, or federal statute, rule, regulation, ordinance or common law, including but not limited to those claims raised in the Action and/or that could have been raised in the Action, and those arising from or related to Plaintiff's employment with Defendant, and the termination of that employment ("Plaintiff's Released Claims"). Plaintiff's Released

7

1

2

3

4

5

6

7

8

9

10

    Claims includes all of the Released Claims as defined herein as well as all other wage and hour claims, claims under California Business and Professions Code section 17200, claims under the Labor Code, including, but not limited to, claims under the PAGA, claims under the Fair Labor Standards Act, and all claims for indemnity or reimbursement of business expenses, overtime compensation, minimum wages, penalties, liquidated damages, and interest, as well as all other claims under state, federal, and local laws, including, without limitation, Title VII of the Civil Rights Act of 1964, the Family Medical Leave Act, the Americans with Disabilities Act, the Fair Credit Reporting Act, the Employee Retirement Income Security Act of 1974, and all of their implementing regulations and interpretive guidelines, as well as the common law, including laws related to discrimination, harassment, or retaliation, arising from or relating to Plaintiff's relationship, or termination of relationship, with any Released Party through the Effective Date for any type of relief. Plaintiff further covenants that he will not become a member of any other legal actions against the Released Parties, as that term is defined, asserting any of Plaintiff's Released Claims, and will opt out of any such actions if necessary.

11

12

13

14

15

(Doc. 29-2, Settlement ¶ 59(c).)  Thus, claims released by Plaintiff—but not the Settlement Class— include any claims arising under the Americans with Disabilities Act, Title VII, 42 U.S.C. § 1981, and the Employee Retirement Income Security Act.  Indeed, the Settlement indicates: "For the avoidance of doubt, this is a complete and general release to the maximum extent by law, and this release excludes only the release of claims not permitted by law."  (*Id*.)

16

### III.     Objections and Opt-Out Procedure

17

18

19

20

21

    The proposed "Notice of Settlement of Class and Representative Action" explains to class members they "do not need to do anything to receive a Settlement Payment."  (Doc. 29-2 at 47.) However, any class member who wishes may file objections or request exclusion from the Settlement. (*Id*. at 31-33, Settlement ¶ 50.)  The proposed notice also explains the procedures to object to the terms and request exclusion from the Settlement Class  (*Id*. at 44-45, 48-49.)

22

### **PRELIMINARY APPROVAL OF A CLASS SETTLEMENT**

23

24

25

26

27

28

    When parties settle the action prior to class certification, the Court has an obligation to "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Preliminary approval of a class settlement is generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). Second, the Court must "determine whether the proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v.*

*Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

**I.      Conditional Certification of a Settlement Class**

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all." Fed. R. Civ. P. 23(a).  Gonzalez seeks "provisional and conditional certification" of a Settlement Class defined as: "all current and former non-exempt California employees of Xtreme who worked at least one shift from December 4, 2016 to March 1, 2022." (Doc. 29-2 at 21, ¶ 3; *see also* Doc. 29-1 at 13, emphasis omitted.)

Parties seeking class certification bear the burden of demonstrating the elements of Rule 23(a) are satisfied, and "must affirmatively demonstrate … compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b).  *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

**A.      Rule 23(a) Requirements**

The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147, 155-56 (1982).  Certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation.  *Falcon*, 457 U.S. at 156.

**1.      Numerosity**

This prerequisite requires the Court to consider "specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is not a specific threshold, joining more than one hundred plaintiffs is impracticable. *See Immigrant*

9

*Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) (finding the requirement "satisfied solely on the basis of the number of ascertained class members"); *Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n.7 (9th Cir. 1977) (a proposed class with 110 members "clearly [included] a sufficient number to meet the numerosity requirements"). Gonzalez reports "[t]here are an estimated 219 Class Members."  (Doc. 29-1 at 14.)  Therefore, joinder of all identified as plaintiffs is impracticable, and the numerosity requirement is satisfied.

## 2.    Commonality

Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, the plaintiff must demonstrate common points of facts and law.  *See Wal-Mart Stores*, 564 U.S. at 350.  Thus, "commonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks, citations omitted).

Gonzalez asserts the commonality requirement is satisfied because "the claims of Gonzalez and the Class Members all flow from the same factual and legal issues."  (Doc. 29-1 at 14.)  Specifically, Gonzalez contends common factual and legal issues include:

> Defendant's alleged uniform practice of requiring its Selma warehouse workers to work off- the-clock without compensation because managers intentionally fail to accurately record all time worked and/or they modify employee time records (JDB Dec. ¶ 47), uniform policy of not providing meal periods (particularly second meal periods), both because the written policy misadvised employees they could waive a second meal period under all circumstances and because they effectively required employees to acknowledge being afforded all meal periods even when such was not the case (JDB Dec. ¶ 49, Exhs. 3, 5), uniform policy of not giving credit to the "major fraction" thereof language with respect to rest periods and thereby denying rest periods (JDB Dec. ¶ 51, Exh. 3), resultant failure to timely pay all wages due and owing at separation or provide uniform itemized wage statements missing critical necessary information required by Labor Code section 226(a)(2), and uniform practice of requiring employees to purchase their own uniforms (JDB Dec. ¶ 35).

(*Id.*, citing Baysinger Decl. [Doc. 29-2 at 7, 10-11].)  Gonzalez contends common questions include:

> determining 1) whether managers at the Selma location routinely advised employees they would clock them out, but instead failed to accurately

10

enter the work stop time (entering the scheduled shift time instead), 2) whether Xtreme's meal period policy misinformed employees they could waive their second meal periods, 3) whether Xtreme's practice of requiring a mandatory waiver of second meal periods is unlawful, 4) whether Xtreme's written policy failed to give effect to the timing requirements for rest periods, and 5) whether Xtreme regularly did not reimburse employees for masks, boots, and uniforms will resolve the liability issues underscoring the Class Claims.

(*Id.*)  Because it appears resolution of the identified issues—such whether Xtreme's practices and policies violated California wage and hour law—apply to the claims of each of the Class Members, the Court finds the commonality requirement is satisfied for purposes of settlement.

### 3.  Typicality

This requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A claim or defense is not required to be identical, but rather "reasonably coextensive" with those of the absent class members.  *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks, citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

Gonzalez contends the typicality requirement is satisfied because he "worked for Defendant during the relevant time period, was subjected to the same uniform polices."  (Doc. 29-1 at 15.) Gonzalez reports he worked a machinist in the company's facility located in Selma, California, beginning in April 2019.  (Doc. 9 at 3, ¶ 8.)  In addition, he asserts that he was classified as a non-exempt employee.  (*Id.*)  As such, Gonzalez "was subjected to the same unlawful policies, practices, and procedures, having been 1) underpaid because of Defendant's failures to pay for all hours actually worked (primarily because of time entry edits), 2) failed to provide meal and rest periods and associated premiums, 3) furnished inaccurate itemized wage statements, 4) not timely paid all wages due and owing upon separation, and 5) not reimbursed all business expenses."  (Doc. 29-2 at 15, ¶ 65.) Thus, Gonzalez asserts that "if he were not serving as Class Representative, [he] would be a member

1  of the Class." (Doc. 29-1 at 15.)

2      Because Gonzalez was subjected to the same company policies and payment procedures as the

3  class members—and Xtreme does not dispute this— the Court finds the typicality requirement is

4  satisfied for purposes of settlement. *See Hanon*, 976 F.2d at 508; *Kayes*, 51 F.3d at 1463.

5                    4.    Fair and Adequate Representation

6      Absentee class members must be adequately represented for judgment to be binding upon

7  them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940). Accordingly, this prerequisite is satisfied if the

8  representative party "will fairly and adequately protect the interests of the class." Fed. R. Civ. P.

9  23(a)(4). "[R]esolution of this issue requires that two questions be addressed: (a) do the named

10  plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the

11  named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego*

12  *Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

13                  *a.*    *Proposed class representative*

14      Gonzalez seeks appointment as the class representative for the Settlement Class. (*See* Doc. 29-

15  1 at 15-16.) Jenny Baysinger, counsel for Gonzalez, asserts that Gonzalez "has been involved through

16  the litigation and has no conflicts with the other members of the Class he seeks to represent." (Doc.

17  29-2 at 15, Baysinger Decl. ¶ 65.) Ms. Baysinger reports:

18          Plaintiff demonstrated his commitment to prosecuting this Class Action
        on behalf of the Class Members by, amongst other things, locating and
19          retaining attorneys, participating in discovery and investigation, filing
        this action and willingly exposing his name and reputation to detriment
20          by filing the Class Action, and helping to facilitate the Settlement for
        which approval is now sought, including participating in and being
21          available throughout the entire remote mediation process.

22  (*Id.*, ¶ 66.) In addition, Ms. Baysinger reports Gonzalez's tasks included: "taking numerous calls with

23  Class Counsel, participating in responding to the Parties' formal and informal information exchange,

24  and participating in the mediation and settlement negotiations...." (*Id.*, ¶ 67.)

25      The parties have not identified any conflict between Gonzalez and the Settlement Class, and

26  review of the allegations and evidence before the Court does not reveal any conflict or unique

27  defenses. Based upon the information by counsel, Gonzalez has actively endeavored to prosecute

28  claims on behalf others similarly situated. Moreover, the interests of Gonzalez are aligned with those

of the class members: to maximize the recovery of pay not received due to the alleged violations of California wage and hour laws.  Thus, for settlement purposes only, the Court also finds Gonzalez is a suitable class representative.

<em>b.      Proposed class counsel</em>

The law firm of Mayall Hurley P.C. has extensive experience litigating employment class actions and serving as class counsel.  Ms. Baysinger reports the firm has "represented plaintiffs in numerous representative employment actions, settlements in which have been approved by multiple California and federal courts, and are currently prosecuting dozens more."  (Doc. 29-2 at 17, Baysinger Decl. ¶ 71.)  She identified more than forty "wage-and-hour class actions with claims similar to the instant matter" in which "Mayall Hurley P.C. has recently been approved as class counsel."  (*Id.* at 16-18, ¶ 71.)  In addition, Ms. Baysiner reports she is "currently lead counsel or co-lead counsel in approximately 8 employment class action cases and a handful of PAGA representative cases."  (*Id.* at 19, ¶ 73.)

The described litigation experiences support a conclusion that counsel prosecuted the action vigorously on behalf of the putative class when the action was filed and the now-proposed Settlement Class.  Further, Xtreme does not oppose appointment of the proposed Class Counsel, or assert the attorneys are inadequate to represent the interest of the class for purposes of the pending settlement. Therefore, the Court finds Mayall Hurley P.C. satisfies the adequacy requirement.

**B.      Certification of a Class under Rule 23(b)(3)**

As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified if it is maintainable under one of the three alternatives identified under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266.  Gonzalez asserts certification of the proposed settlement class is appropriate under Rule 23(b)(3).  (Doc. 29-1 at 16-17.)

A class is maintainable under Rule 23(b)(3) where (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  These two requirements are generally called the "predominance" and "superiority" requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart*

13

*Stores*, 564 U.S. at 363 ("(b)(3) requires the judge to make findings about predominance and superiority before allowing the class").

Gonzalez contends the predominance requirement is satisfied because "the policies and practices alleged to underscore the Class Claims apply class-wide and Defendant's liability can be determined by facts, and applicable law, common to all Class Members…." (Doc. 29-1 at 16.)  In addition, Gonzalez contends a class action is a superior method of adjudication.  (*Id.* at 16-17.)  According to Gonzalez, "The value of each individual claim is relatively insignificant and is likely not enough to incentivize individual action."  (*Id.*, citing *Wolin v. Jaguar Land Rover N.A., LLC*, 617 F.3d 1168, 1175-1176 (9th Cir. 2010).)  Specifically, Gonzalez notes that "[t]he average maximum recovery per Class Member is less than $10,000 ($1,996,648.76/219 = $9,117.11)" and asserts "such a small amount is not likely to motivate individual representation and/or prosecution."  (*Id.*, emphasis omitted; *see also* Doc. 29-2 at Baysinger Decl. ¶ 36 [indicating "Xtreme's exposure for damages and statutory penalties based on the Class Claims was calculated at $1,996,648.76"].)

As Gonzalez argues, it appears the class claims are subject to proof by common evidence related to the alleged policies and practices.  There is no evidence—particularly at this juncture— that class members desire to individually litigate the claims.  Further, there are no identified issues of manageability that would preclude certification.  Consequently, the Court finds conditional certification of the proposed Settlement Class is proper under Rule 23(b)(3).

## II.      Evaluation of the Settlement Terms

Settlement of a class action requires approval of the Court, which may be granted "only after a hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  Approval is required to ensure settlement is consistent with the plaintiff's fiduciary obligations to the class.  *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  Toward that end, "Congress and the Supreme Court amended Rule 23(e) to set forth specific factors to consider in determining whether a settlement is 'fair, reasonable, and adequate.'"  *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021); *see* Fed. R. Civ. P. 23(e)(2) (effective Dec. 1, 2018).  Rule 23(e)(2) now directs the Court to consider whether:

> (A) the class representatives and class counsel have adequately represented
> the class;

14

(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
    (i) the costs, risks, and delay of trial and appeal;
    (ii) the effectiveness of any proposed method of distributing relief to
    the class, including the method of processing class-member claims;
    (iii) the terms of any proposed award of attorney's fees, including
    timing of payment; and
    (iv) any agreement required to be identified under Rule 23(e)(3); and
(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *see also Briseño*, 998 F.3d at 1023-24.  The Ninth Circuit determined this revision to Rule 23 requires courts "to go beyond [its] precedent." *Briseño*, 998 F.3d at 1026.[2]

## A.  Representation of the Class

To determine adequacy of representation under Rule 23(e)(2), the Court may consider whether the interests of the named plaintiff are "aligned with the interests of the Class Members." *See Cottle v. Plaid Inc.*, 240 F.R.D. 356, 376 (N.D. Cal. 2021). In addition, a finding that "Class Counsel are experienced and competent" supports a conclusion that the class is adequately represented. *Id.; see also In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.").  Thus, the adequacy analysis under Rule 23(e)(2) is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *Moreno v. Beacon Roofing Supply, Inc.*, 2020 WL 1139672 *at 5 (S.D. Cal. Mar. 9, 2020).

Gonzalez's interests appear aligned with those of class members, as they share a common interest in challenging the alleged wrongful wage and hour policies.  In addition, Class Counsel are clearly experienced in class action litigation.  (*See* Doc. 29-2 at 16-18, Baysinger Decl. ¶ 71.)  Because Gonzalez carried the burden to show the adequacy prerequisite was satisfied under Rule 23(a), the

[2] Previously, the Ninth Circuit had identified several factors to determine whether a settlement agreement meets these standards, including:

the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (citation omitted).  Although Plaintiff refers to the factors under the Ninth Circuit precedent (Doc. 75 at 22-23), the Court focuses its analysis on the factors enumerated in Rule 23. *See Briseño*, 998 F.3d at 1026; *see also Herrera v. Wells Fargo Bank, N.A.*, 2021 U.S. Dist. LEXIS 170195, at *21 (C.D. Cal. June 8, 2021) ("The goal of [amended Rule 23(e)] is … to focus the [district] court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal") (quoting Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes).

15

Court finds the requirement under Rule 23(e)(2) is also satisfied.  *See Moreno*, 2020 WL 1139672 *at 5 ("Because the Court found that adequacy under Rule 23(a)(4) has been satisfied above, due to the similarity, the adequacy factor under Rule 23(e)(2)(A) is also met.").

### B.        Negotiation of the Settlement

Under Rule 23, the Court must consider whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).  The Ninth Circuit also "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in evaluating a proposed class action settlement. *Rodriguez v. W. Publ'g Corp*., 563 F.3d 948, 967 (9th Cir. 2009).  The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others.  *Staton*, 327 F.3d at 960.  The Ninth Circuit observed that "settlement class actions present unique due process concerns for absent class members" because the "inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee."  *See In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks, citations omitted). Thus, the Court must consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining—as Gonzalez asserts (Doc. 29-1 at 10, 18)— or if the agreement is the product of collusion or fraud.  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).

In particular, when a class action settlement agreement is reached prior to a class being certified, district courts must be watchful "not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d at 94; *see also Briseño*, 998 F.3d at 1023.  These "more subtle signs" include: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds" and "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) "when the parties arrange for fees not awarded to

1   revert to defendants rather than be added to the class fund." *Id.* (internal quotations, citations omitted).

2   1.   Whether there is a disproportionate distribution to counsel

3          The Settlement provides that Class counsel may request attorneys' fees up to $96,666.67, which

4   is one third of the gross settlement fund.  (Doc. 29-2 at 27, Settlement ¶ 45(b).)  The typical range of

5   acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with

6   25% considered the benchmark.  *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).  Because the

7   fees requested are within the range awarded by the Ninth Circuit from the gross settlement fund, the

8   Court finds the Settlement Agreement does not provide a disproportionate distribution to Class

9   Counsel.  *See Millan v. Casvade Water Servs.*, 310 F.R.D. 593, 612 (E.D. Cal. 2015) (finding no

10  disproportionate distribution where class counsel was to receive a third of the settlement fund "although

11  significantly above the benchmark for this Circuit," because it was "not unreasonable as an upper

12  bound" of fees awarded in the Circuit).

13  2.   Existence of a "clear sailing" agreement

14         In general, a "clear sailing" provision is one in which the parties agree to the "payment of

15  attorneys' fees separate and apart from class funds."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654

16  F.3d at 947. However, the Ninth Circuit recognized also a "clear sailing" arrangement exists when a

17  defendant expressly agrees not to oppose an award of attorneys' fees up to an agreed upon amount.

18  *Lane*, 696 F.3d at 832; *In re Bluetooth Headset Prods.*, 654 F.3d at 947.

19         Xtreme agreed the company "will not oppose requests for a Class Counsel Fees Payment and

20  Class Counsel Litigation Expenses Payment consistent with this Agreement and approved by the

21  Court." (Doc. 29-2 at 27, Settlement ¶ 45(b).)  Thus, the Settlement includes a version of a "clear

22  sailing agreement."  Nevertheless, the existence of a clear sailing provision is not necessarily fatal to

23  approval.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 948; *see also In re Toys R Us-

24  Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D.

25  Cal. 2014) ("a clear sailing agreement is one where the party paying the fee agrees not to contest the

26  amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling").

27  Rather, "when confronted with a clear sailing provision, the district court has a heightened duty to peer

28  into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the

17

1  class." *Id.* (citing *Staton*, 327 F.3d at 954).

2       No evidence is currently before the Court to evaluate the reasonableness of the fees requested

3  or the tasks undertaken on behalf of the Settlement Class.  However, the Court will determine at the

4  final approval stage whether the fees are reasonable, based upon evidence submitted by counsel.

5  Thus, this factor does not weigh against preliminary approval of the settlement and will be revisited

6  upon the filing of a motion for attorneys' fees and final approval of the terms.  *See Singh v.*

7  *Roadrunner Intermodal Servs. LLC*, 2019 WL 316814 at *7-8 (E.D. Cal. Jan 24, 2019) (not finding

8  collusion between the parties, despite a clear sailing agreement, where the fee award was analyzed and

9  determined to be reasonable).

10         3.     Whether there is a reversion to Defendant

11       Finally, the parties did not arrange for any unawarded fees to revert to Xtreme.  Instead, the

12  parties acknowledge in the Settlement Agreement that the Court may approve less than the requested

13  amount of fees, in which case the unawarded fees will be retained in the Net Settlement Amount.  (Doc.

14  29-2 at 27, Settlement ¶ 45(e).)  Because unawarded fees will be retained in the Net Settlement Amount

15  for distribution to participating class members, this factor does not support a finding of collusion

16  between the parties.

17         4.     Findings on collusion

18       Based upon the factors set forth by the Ninth Circuit, the Court finds the proposed settlement

19  "appears to be the product of serious, informed, non-collusive negotiations."  *See In re Tableware*

20  *Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007).  Thus, this factor under Rule 23

21  supports preliminary approval of the class settlement.

22      **C.**    **Relief Provided to the Class**

23       The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of

24  absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Commission*, 688

25  F.2d 615, 624 (9th Cir. 1982) (citation omitted).  When analyzing an agreement, the Court should

26  examine "the complete package taken as a whole," and the proposed settlement is "not to be judged

27  against a hypothetical or speculative measure of what *might* have been achieved by the negotiators."

28  *Officers for Justice*, 688 F.2d at 625, 628.

The proposed gross settlement amount is $290,000 of which $280,000 is apportioned for resolution of the Released Class Claims.  (Doc. 29-2 at 22, Settlement ¶ 17; Doc. 29-1 at 19.)  After the anticipated deductions from the gross fund, the parties estimate that $158,833.33 will be dispersed to Participating Class Members.  (*Id*. at 28, Settlement ¶ 46.)  In addition, Gonzalez anticipates that the average net recovery for each Participating Class Member is $725.26.  (Doc. 29-1 at 18.)  Analyzing the factors identified in Rule 23, as discussed below, the Court finds the amount offered and relief provided to the Settlement Class supports preliminary approval of the Settlement.

### 1.    Costs, risks, and delays

"A[] central concern [when evaluating a proposed class action settlement] … relate[s] to the cost and risk involved in pursuing a litigated outcome." *Feltz v. Cox Comm's Cal., LLC*, 2022 WL 2079144 at *9 (C.D. Cal. Mar. 2, 2022), quoting Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes [modifications in original].)  Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the settlement were to be rejected, the parties would have to engage in further litigation, including seeking class certification and discovery on the issue of damages.

The parties agree the claims are "highly disputed."  (Doc. 29-2 at 39, Settlement ¶ 63)(a)(i).)  In the Settlement Agreement, the parties indicated: "Defendant and the Released Parties deny that they have engaged in any unlawful activity, have failed to comply with the law in any respect, have any liability to anyone under the claims asserted in the Action, or that but for the Settlement a class should be certified in the Action."  (*Id*.)  Gonzalez observes:

> Defendant asserts and would have continued to assert numerous legal and factual grounds to defend against each of the Class Claims and/or certification of such claims, including, but not limited to, 1) that the "off-the-clock" claim lacks merit, 2) that its meal and rest period policies are facially lawful, 3) that, even if facially unlawful, there were no meal/rest period violations as evidenced by the acknowledgments routinely signed by Class Members, 4) that the UCL claim cannot proceed because of *Sonner* [*v. Premier Nutrition*, 971 F.3d 834, 845 (9th Cir. 2020], 5) that Gonzalez did not suffer any injury from the derivative wage statement violations, and 6) that any failure to pay waiting time penalties was not sufficiently "willful" to justify their imposition.

(*Id*. at 19-20.)  Gonzalez contends that "continued litigation was guaranteed to be costly, time consuming, and uncertain in outcome."  (*Id*. at 20.)  However, "the Settlement ensures timely relief and

1    meaningful monetary recovery for Class Members." (*Id.*)

2    Notably, employment law class actions are, by their nature, time-consuming and expensive to

3    litigate. *Hightower v. JPMorgan Chase Bank, N.A.*, 2015 WL 9664959 at *6 (C.D. Cal. Aug. 4, 2015).

4    If the Settlement is rejected, the parties would have to engage in further litigation, including seeking

5    class certification and discovery on the issue of damages. The time and expense of continued litigation

6    could outweigh any additional recovery. On the other hand, the proposed settlement provides for

7    immediate recovery on claims presented by Gonzalez on behalf of the class. Due to the acknowledged

8    disputed liability, risk of the claims of class members, costs of future litigation that may reduce the

9    recovery to class members, and delay in payments if the settlement is not approved, this factor weighs

10   in favor of preliminary approval of the Settlement. *See Rodriguez*, 563 F.3d at 966 (risk, expense,

11   complexity and duration of litigation supports settlement); *Curtis-Bauer v. Morgan Stanley & Co., Inc.*,

12   2008 WL 4667090, at *4 (N.D. Cal. Oct. 22, 2008) ("Settlement avoids the complexity, delay, risk and

13   expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery

14   for the Plaintiff class.").

15                    2.      Proposed distribution

16   "[T]he goal of any distribution method is to get as much of the available damages remedy to

17   class members as possible and in as simple and expedient a manner as possible." *Hilsley v. Ocean*

18   *Spray Cranberries, Inc.*, 2020 WL 520616 at *7 (S.D. Cal. Jan. 31, 2020) (citing "Final approval

19   criteria—Rule 23(e)(2)(C)(ii): Distribution method," 4 NEWBERG ON CLASS ACTIONS § 13:53

20   (5th ed.)). "Often it will be important for the court to scrutinize the method of claims processing to

21   ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23(e), 2018 Advisory Committee

22   Notes. "A claims processing method should deter or defeat unjustified claims, but the court should be

23   alert to whether the claims process is unduly demanding." *Id*.

24   Class members are not required to take any action, such as submitting a claim form, to receive

25   their settlement payment. (Doc. 29-2 at 22, ¶ 9; *see also id.* at 26, ¶ 43.) Rather, class members need

26   only take action if they wish to opt-out of the settlement, object to any of the terms, or dispute the

27   amount of their individual settlement share. Because the class members are not required to submit and

28   claim form, the proposed method of distribution will facilitate payment for legitimate claims and is not

1   "unduly demanding" upon Settlement Class members.  Thus, this factor weighs in favor of preliminary

2   approval of the settlement. *See Jackson v. Fastenal Co.*, 2021 WL 5755583 at *11 (E.D. Cal. Dec. 3,

3   2021) (finding "the proposed method of distributing relief is effective, and weighs in favor of a finding

4   that the settlement agreement is fair, reasonable and adequate" where the class members did not have

5   to file a claim).

6              3.      Attorneys' fees

7        Under Rule 23, "courts must scrutinize 'the terms of any proposed award of attorney's fees.'"

8   *McKinney-Drobnis v. Oreshack*, 16 F.14th 594, 607 (9th Cir. 2021) (quoting Fed. R. Civ. P.

9   23(e)(2)(C)(iii). The Ninth Circuit explained, "the new Rule 23(e) makes clear that courts must balance

10  the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining

11  whether the settlement is 'adequate' for class members." *Id.*, quoting *Briseño*, 998 F.3d at 1024.

12       As discussed above, Class Counsel may request fees in the amount of one-third of the

13  settlement fund.  (Doc. 29-2 at 27, ¶ 45(b).)  The Court-approved payment shall be made by the out of

14  the Gross Settlement Amount by the Settlement Administrator within 14 days of Xtreme providing the

15  funds to the Settlement Administrator.  (*Id.* at 36, ¶ 56.)  In that same 14-day period, the Settlement

16  Administrator will issue the other approved payments, including to Class Members.  (*Id.*)  Thus,

17  counsel will receive payment in the same period of time as Class Members, and the timing of payment

18  does not weigh against preliminary approval of the Class Settlement.

19       The fees to which the parties have agreed fall within the range of acceptable attorneys' fees in

20  the Ninth Circuit.  *See Powers*, 229 F.3d at 1256.  Importantly, however, any party seeking fees bears

21  the burden of establishing that the fees and costs were reasonably necessary to achieve the results

22  obtained.  *See Fischer v. SJB-P.D., Inc.,* 214 F.3d 1115, 1119 (9th 2000).  Therefore, a fee applicant

23  **must provide time records documenting the tasks completed and the amount of time spent on**

24  **the action**.  *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co*., 480

25  F.3d 942, 945-46 (9th Cir. 2007).  Because the identified percentage of the gross fund is within the

26  accepted range outlined by the Ninth Circuit, this amount is approved preliminarily.  The Court will

27  evaluate the reasonableness of the fee request and the exact amount of the fee award upon application

28  by Class Counsel with final approval of the settlement.

#### 4.      Agreement required to be identified

The Court must consider any agreement that is required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C)(iv).  Specifically, "parties seeking approval must file a statement identifying any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(3). The parties have identified no such agreement and the Court is not aware of any such agreement.  Thus, this factor does not weigh against preliminary approval.

### D.      Treatment of Class Members

Rule 23 requires the Court to consider whether the proposed settlement "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  "A distribution of relief that favors some class members at the expense of others may be a red flag that class counsel have sold out some of the class members at the expense of others, or for their own benefit."  *Hilsley*, 2020 WL 520616 at *7 (citation omitted).

Here, the parties agreed that class members who do not timely opt-out of the Settlement will receive a *pro rata* share of the Net Settlement Amount, calculated with the following formula:

> (i) First, using the Class Data List, the Administrator will compute the total number of workweeks of all Participating Class Members collectively during the Class Period; this sum shall be known as the "Workweek Total;" (ii) Second, the Administrator will divide the Net Settlement Amount by the Workweek Total to determine the settlement value of each eligible Workweek; this shall be known as the "Workweek Value;" (iii) Third, the Administrator will multiply the number of Workweeks of a Participating Class Member during the Class period by the Workweek Value to determine the Participating Class Member's Individual Class Settlement Payment.

(Doc. 29-2 at 28, ¶ 46(a).)

Because the Settlement provides *pro rata* distribution to Class Members based upon the number of workweeks, the agreement treats the Class Members equitably, and the proposed distribution plan supports preliminary approval.  *See Cooks v. TNG GP*, 2021 WL 5139613 at *4 (E.D. Cal. Nov. 4, 2021) (observing that the calculation of payments to class members "on a pro-rata basis based on the number of compensable workweeks each member worked … is fair and treats class members equitably"); *see also Gomez-Gasca v. Future AG Mgmt. Inc.*, 2020 WL 6149688 at *4 (N.D. Cal. Oct. 20, 2020) (noting that in the preliminary approval stage, "the Court approved the proposed

1  plan pro rata allocation based on the number of workweeks the class member performed work during

2  the Class Period"); *In re Regulus Therapeutics Sec. Litig.*, 2020 WL 6381898 at *5 (S.D. Cal. Oct. 29,

3  2020) (finding a *pro rata* distribution plan was equitable and weighed in favor of approving the

4  settlement terms).

5       **E.**     **Class Representative Service Payment**

6       Incentive awards, service payments, for class representatives are not to be given routinely by

7  the Court.  In *Staton*, 327 F.3d at 975, the Ninth Circuit explained:

8       Indeed, '[i]f class representatives expect routinely to receive special
   awards in addition to their share of the recovery, they may be tempted

9       to accept suboptimal settlements at the expense of the class members
   whose interests they are appointed to guard." *Weseley v. Spear, Leeds*

10      *& Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989); *see also Women's
   Comm. for Equal Employment Opportunity v. Nat'l Broad. Co.*, 76

11      F.R.D. 173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs
   make what amounts to a separate peace with defendants, grave

12      problems of collusion are raised.").

13 The Court observed that "'excessive payments to named class members can be an indication that the

14 agreement was reached through fraud or collusion.'"  *Id.* (citation omitted).  In evaluating the

15 enhancement award to a class representative, a court should consider all "relevant factors including the

16 actions the plaintiff has taken to protect the interests of the class, the degree to which the class has

17 benefitted from those actions, …  the amount of time and effort the plaintiff expended in pursuing the

18 litigation … and reasonable fears of workplace retaliation."  *Staton*, 327 F.3d at 977.

19      Pursuant to the agreement, Gonzalez may seek a "Class Representative Service Payment" up to

20 $5,000.  (Doc. 29-2 at 26, Settlement ¶ 45(a).)  The Settlement explains the payment is to be given to

21 Gonzalez "to compensate him for initiating the Action, performing work in support of the Action,

22 undertaking the risk of liability for Defendant's expenses in the event he failed in the prosecution of the

23 Action, and for the general release of all claims by him…."  (*Id.* at 22, ¶11.)  Significantly, however,

24 Gonzalez did not submit a declaration in support of the motion addressing the tasks undertaken *on*

25 *behalf of the class* in this action.  There is limited evidence related to the work performed by Gonzalez,

26 and he has not estimated the number of hours spent working with Class Counsel.  Without additional

27 information the Court is unable to evaluate the reasonableness of this requested award at this time.  In

28 seeking final approval, **Gonzalez must provide evidence supporting the requested service payment.**

23

Nevertheless, given the flexibility for an award *up to* $5,000, the request for approval of a class representative enhancement is preliminarily approved.

### F.   Views of Counsel

As addressed above, Class Counsel are experienced in class action litigation.  Ms. Baysinger indicates a belief that the Settlement "will result in substantial benefits to all Class Members and is in the collective best interest of the Class."  (Doc. 29-2 at 5, Baysinger Decl. ¶ 24.)  The Settlement also provides: "The Parties and their respective counsel believe and warrant that this Agreement reflects a fair, reasonable, and adequate settlement of the Action…."  (*Id.* at 40, Settlement ¶ 69.)  These opinions of counsel are entitled to significant weight and support approval of the Settlement.  *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation"); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.").

### G.   Reaction of Class Members to the Proposed Settlement

Gonzalez has agreed to the terms of Settlement Agreement.  (*See* Doc. 29-2 at 42.)  However, the remaining Class Members have not yet received notice of the Settlement or its terms.  Therefore, this factor shall be revisited for final approval of the Settlement.  *See Cottle*, 340 F.R.D. at 376 ("The reaction of the class members is best assessed at the final approval hearing since the court can look at how many class members submitted … objections").

## APPROVAL OF PAGA SETTLEMENT

California adopted its Private Attorney General Act to allow individual plaintiffs "to bring a civil action to collect civil penalties for Labor Code violations previously only available in enforcement actions initiated by the State's labor law enforcement agencies." *Caliber Bodyworks, Inc. v. Superior Court*, 134 Cal. App. 4th 365, 374 (2005); *see also* Cal. Lab. Code § 2699(a); *Urbino v. Orkin Servs. of Cal., Inc.*, 726 F.3d 1118, 1121 (9th Cir. 2013).  Thus, a PAGA plaintiff now acts "as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009).

Pursuant to PAGA, an "aggrieved employee" may bring an action for civil penalties for labor

code violations on behalf of himself and other current or former employees.  Cal. Lab. Code § 2699(a).

PAGA defines an "aggrieved employee" as "any person who was employed by the alleged violator

and against whom one or more of the alleged violations was committed."  *Id*.  A judgment in a PAGA

action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment

in an action brought by the government." *Arias*, 46 Cal. 4th at 986.

To bring an action under PAGA, an aggrieved employee must first provide written notice to the

employer and the Labor and Work Force Development Agency.  Cal. Lab. Code § 2699.3(a)(1).

Recovery under PAGA is limited to civil penalties, and the civil penalties must be allocated with 75%

directed to the LWDA and 25% to aggrieved employees.  *Id.* § 2699(i).  Any proposed settlement of

PAGA claims must be submitted to the LWDA, and a trial court must "review and approve" any

settlement of PAGA claims. *Id.* § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp*., 383 F.

Supp. 3d 959, 971 (N.D. Cal. 2019) (because settling a PAGA claim "compromises a claim that could

otherwise be brought be the state," it requires that a court "review and approve any settlement of any

civil action pursuant to [PAGA]") (citation omitted).

Although there is no binding authority establishing the standard of review for PAGA

settlements, California district courts "have applied a Rule 23-like standard, asking whether the

settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's

policies and purposes.'" *Haralson*, 383 F. Supp. 3d at 972.  This standard is derived principally from

the LWDA itself.  *See O'Connor v. Uber Techs., Inc*., 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016).

The LWDA indicated:

> It is thus important that when a PAGA claim is settled, the relief provided
> for under the PAGA be genuine and meaningful, consistent with the
> underlying purpose of the statute to benefit the public and, in the context
> of a class action, the court evaluate whether the settlement meets the
> standards of being "fundamentally fair, reasonable, and adequate" with
> reference to the public policies underlying the PAGA.

*Id.* (citation omitted). When a proposed settlement involves overlapping class action and PAGA

claims, courts may employ a "sliding scale" in determining if the proposed settlement is

"fundamentally fair, reasonable, and adequate with reference to the public policies underlying the

PAGA." *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following

1  *O'Connor*); *Cooks v. TNG GP*, 2020 WL 5535397 at *9-10 (E.D. Cal. Sept. 15, 2020) (same).

2  "[W]here the settlement for the rule 23 class is robust, the purposes of PAGA may be concurrently

3  fulfilled." *Cooks*, 2020 WL 5535397 at *10 (quoting *O'Connor*, 201 F. Supp. 3d at 1134).

4        Class Counsel reports that the proposed Settlement Agreement was submitted to the LWDA in

5  compliance with the Labor Code.  (Doc. 29-2 at 15, Baysinger Decl. 64; *see also id.* at 60, Exh. 6 [e-

6  mail confirmation of the submission to the LWDA].  The settlement fund of $290,000.00 appears

7  sufficiently large—with more than $150,000 going to the class members—such that the Court finds

8  the purposes of PAGA to address the alleged labor violations are fulfilled by the proposed agreement.

9  Under the Settlement Agreement, $10,000 of the Gross Settlement Amount is designated as the PAGA

10  payment.  (Doc. 29-2 at 23, Settlement ¶ 25.)  The Settlement properly designates 75% of the PAGA

11  funds to the LWDA—in the amount of $7,500 from the Gross Settlement Amount—and the remaining

12  $2,500 to the aggrieved employees.  (*Id.*; *see also id.* at 27, ¶ 45(c).)  Accordingly, the Court finds

13  approval of the PAGA payment is also appropriate.  *See Jamil v. Workforce Resources*, 2020 WL

14  6544660 at *6 (S.D. Cal. Nov. 5, 2020) (finding a $10,000 PAGA award to be fair and adequate as

15  part of a class settlement).

16  **APPOINTMENT OF SETTLEMENT ADMINISTRATOR**

17        The parties agreed upon and propose that the Court appoint Simpluris, Inc., to serve as the

18  Settlement Administrator.  (Doc. 29-2 at 29, Settlement ¶ 29.)  As explained in the Settlement, the

19  duties of Simpluris will include:

20  > formatting, printing, and mailing the Notice Packet to all Class Members;
21  > conducting a National Change of Address search to update Class Member
   > addresses before mailing the Notice Packets; re-mailing Notice Packets
22  > that are returned to the Class Member's new address as located upon skip-
   > tracing or as provided by Counsel for the Parties; setting up a toll-free
23  > telephone number to receive calls from Class Members, and a post office
   > box to receive communications from Class Members which include for
24  > instance, disputed claims, change of address forms, requests for exclusion,
   > and objections, providing the Parties with weekly status reports,
25  > calculating Individual Class Settlement Payments and Individual PAGA
   > Payments; issuing the checks to effectuate the payments due under the
26  > Settlement; issuing the tax reports and filings required under this
   > Settlement and to administrate the Settlement, including, but not limited
27  > to, the DE 9, the DE 9C, 1099s, W-2s and W-3s; handling uncashed
   > checks, and providing declarations as requested by the Parties, and
28  > otherwise administering the Settlement pursuant to this Agreement.

1   (*Id.*)  In anticipation of the administration expenses, $5,500 from the settlement fund was designated

2   for the Settlement Administrator.  (*Id.* at 27, Settlement ¶ 45(d).)  Based upon the recommendation and

3   request of the parties, Simpluris is appointed as the Settlement Administrator.

### APPROVAL OF CLASS NOTICE

5   The class notice must satisfy the requirements of the Federal Rules of Civil Procedure, which

6   provides the notice "must clearly and concisely state in plain, easily understood language" the

7   following information:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the
> class claims, issues, or defenses; (iv) that a class member may enter an
> appearance through an attorney if the member so desires; (v) that the court
> will exclude from the class any member who requests exclusion; (vi) the
> time and manner for requesting exclusion; and (vii) the binding effect of a
> class judgment on members under Rule 23(c)(3).

12  Fed. R. Civ. P. 23(c)(2)(B).  A class notice must be "reasonably calculated, under all circumstances, to

13  apprise interested parties of the pendency of the action and afford them an opportunity to present their

14  objections."  *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

15  **I.      Content of the Notice**

16  Gonzalez submitted the proposed "Notice of Settlement Class and Representative Action" (the

17  "Notice").  (Doc. 29-2 at 44-50.)  The Notice provides information regarding the background of the

18  action, defines the class, and explains the claims asserted by Gonzalez that resolved as a result of

19  settlement.  (*Id.* at 44-46.)  The Notice also explains the terms and provisions of the Settlement,

20  including the claims released by participating class members and the binding effect of judgment.  (*Id.*

21  at 46-48.)  The Notice informs class members of the payments to be made from the Gross Settlement

22  Amount—including the maximum attorneys' fees of $96,666.67 and class representative payment of

23  $5,000—and that the payments from the Gross Settlement Amount are subject to Court approval.  (*Id.*

24  at 46.)  In addition, class members will receive estimates of their payments.  (*Id.* at 47.)

25  Further, the Notice explains the rights and procedures to object to the Settlement, or elect not

26  to participate in the Settlement, and will include the applicable deadlines. (Doc. 29-2. at 44-45, 48-49.)

27  Finally, the Notice informs class members: "You also have the right to hire an attorney (at your own

28  cost) to represent you, or to enter an appearance and represent yourself."  (*Id.* at 46.)

## II.        Method and Administration of Notice Packet

Within 20 days of the date of service of this Order, Xtreme shall provide the "Class Data List" to the Settlement Administrator, which includes to the extent available: "each Class Member's full name; last-known mailing address; telephone number; Social Security number; number of workweeks (full or partial) worked by each individual Class Member during the Class Period; and number of Pay Periods (full or partial) worked as a PAGA Member during the PAGA Period." (Doc. 29-2 at 21-22, Settlement ¶ 7; *id.* at 30, ¶ 49(a).)

Within three days of receiving the data, the Settlement Administrator shall notify counsel of the receipt. (Doc. 29-2 at 30, Settlement ¶ 49(a).) Within 21 days of receiving the data, the Settlement Administrator will mail the Notice Packet[3] via first-class U.S. Mail. (*Id.*, Settlement ¶ 49(b).) However, prior to mailing, the Settlement Administrator shall "perform a search of the United States Post Office's National Change of Address database to update and correct any known or identifiable changes to Class Member addresses…." (*Id.*) For any Notice Packet returned due to an incorrect address, the Settlement Administrator will "search for a more current address and re-mail the Notice Packet to the Class Member" within ten days. (*Id.* at 31, Settlement ¶ 49(d).) The Settlement Administrator shall "notify Counsel for the Parties of the date of each such re-mailing as part of a weekly status report provided to the Parties." (*Id.*)

Class Members who elect not to participate in the Settlement will have 45 days from the date the Notice is mailed to submit a written request for exclusion to the Settlement Administrator. (Doc. 29-2 at 32, Settlement ¶ 50(c).) To be valid, a request for exclusion must be timely submitted and include: "(1) the name and address of the Class Member requesting exclusion; (2) a statement expressing that the Class Member elects to be excluded from the Settlement; and (3) a signature by the Class Member." (*Id.* at 33, ¶ 50(c)(i).) Individuals who properly submit a request for exclusion will not be entitled to a settlement share; will not be bound by the terms of the agreement, including "the Released Claims and the Judgment;" and will not be permitted to file objections to the Settlement or

---

[3] The Notice Packet "include[s] a Notice of Class Action Settlement, Change of Address form, and a pre-printed return envelope…." (Doc. 29-2 at 31, Settlement ¶ 49(b).) The exterior of the envelope will be labeled: "IMPORTANT LEGAL DOCUMENT: You may get Money from a Class Action Settlement; your prompt reply to correct a bad address is required." (*Id.* at 31, ¶ 49(c), emphasis omitted.)

appear at the final approval hearing. (*Id.*, ¶ 50(c)(ii), (iv).)

Similarly, Class Members who wish to object to the Settlement have 45 days to submit a written objection to the Settlement Administrator.  (Doc. 29-2 at 32, Settlement ¶ 50(a).)  Any objection must be signed by the Class Member and include: "(1) the full name and address of the objecting Class Member; (2) the grounds for each objection made; and (3) whether the Class Member intends to appear at the Final Approval Hearing."  (*Id.*)  If any attorney seeks to represent a Class Member who does not submit written objections, the attorney "must file a notice of appearance with the Court and serve Class Counsel and Defendant's Counsel with this notice no later forty five (45) days after the Administrator mailed the Notice Packets."  (*Id.*)  Thus, a notice of appearance is due on the same date as any written objections.  Class Members who fail to comply with these terms.  Class Members will not be permitted to make objections at the Final Approval and Fairness Hearing unless they have submitted a timely written objection that includes notice of intention to appear.

Before the hearing for final approval, the Settlement Administrator shall serve the parties with a "declaration of due diligence setting forth its compliance with its obligations under this Agreement and detailing the requests for exclusions, disputed claims, and objections received."  (Doc. 29-2 at 31, Settlement ¶ 49(f).)  The declaration shall include the number of Class Members to whom Notice Packets were sent and the number of Class Members to whom the Notice Packets were delivered. Further, this declaration shall be filed with the Court with the motion for final approval of the Settlement.

## III.    Required Revisions to the Notice Packet

The Notice Packet must be modified to include information in this Order, including the date of the hearing for final approval. In addition, the Notice must be modified to include deadlines for requesting exclusion, any objections to the Settlement, and disputes of the employment information for the class member.  The Notice Packet also must be updated with contact information for Simpluris as the Settlement Administrator, including the proper phone number and mailing address.

If Gonzalez intends to issue a Spanish language translation of the Notice, he is informed the Court requires a declaration that the Notice was translated by a certified court interpreter, asserting the translation is an accurate translation of the Court-approved English version of the Notice.

## <u>CONCLUSION AND ORDER</u>

Based upon the foregoing, the Court finds the proposed class settlement is fair, adequate, and reasonable.  The factors set forth under Rule 23 and Ninth Circuit precedent weigh in favor of preliminary approval of the settlement agreement. Accordingly, the Court **ORDERS**:

1.   Plaintiff's request for conditional certification of the Settlement Class is **GRANTED**, and the class is defined as follows:

> All current and former non-exempt California employees of Xtreme who worked at least one shift from December 4, 2016 to March 1, 2022.

2.   Preliminary approval of the parties' proposed settlement agreement is **GRANTED**.

3.   Preliminary approval of the PAGA payment is **GRANTED**.

4.   The proposed notice plan and deadlines are **APPROVED**.

5.   Rudy Gonzalez is **APPOINTED** the Class Representative for the Settlement Class.

6.   The firm of Mayall Hurley P.C.is **APPOINTED** as Class Counsel.

7.   Simpluris, Inc. is **APPOINTED** as the Settlement Administrator, with responsibilities pursuant to the terms set forth in the Settlement Agreement.

8.   The Class Representative incentive award for Plaintiff is **GRANTED** preliminarily up to the amount of $5,000, subject to a petition and review at the Final Approval and Fairness Hearing.  Class Members and their counsel may support or oppose this request, if they so desire, at the Final Approval and Fairness Hearing.

9.   Class Counsel's request for fees not to exceed 33 1/3% of the gross settlement amount and costs to be determined is **GRANTED** preliminarily, subject to review of counsel's petition for fees and costs at the Final Approval and Fairness Hearing.  Class Members and their counsel may support or oppose this request, if they so desire, at the Final Approval and Fairness Hearing.

10.   The petition for attorneys' fees and for class representative enhancement fee **SHALL** be filed no later than **February 10, 2023**.

11.   Costs of settlement administration shall not exceed $5,500.

12.   The proposed Notice Packet is preliminarily **APPROVED**, and the parties **SHALL** file

a finalized Notice with the required revisions for the Court's approval within seven days of the date of service of this Order.

13. Defendants **SHALL** provide the Settlement Administrator with the Class Data List no later than **November 14, 2022**.

14. The Settlement Administrator **SHALL** mail the approved Class Notice Packet no later than **December 5, 2022**.

15. A Class Member who wishes to be excluded from settlement shall postmark a written request for exclusion no later than **January 19, 2023**.

16. Any objections to or comments on the Settlement Agreement must be submitted to the Settlement Administrator no later than **January 19, 2023**.

17. A Final Approval and Fairness Hearing is SET for **March 10, 2023** at 9:00 a.m. At this hearing, the Court shall determine whether the Settlement should be granted final approval as fair, reasonable, and adequate as to the class members.  The Court shall hear all evidence and argument necessary to evaluate the Settlement and other motions and requests, including the class representative enhancement request and motion for attorneys' fees.

18. Class Members may appear at the hearing on **March 10, 2023**, in person or through his or her own attorney, to show cause why this Court should not approve the Settlement Agreement, or to object to the motion for attorneys' fees or class member representative enhancement award.  For comments or objections to be considered at the hearing, the Class Member must file comments with the Clerk of this Court indicating briefly the nature of the Class Member's comments, support, or objection.

19. The Court reserves the right to vacate the Final Approval and Fairness Hearing if no comments or objections are filed with this Court on or before **January 19, 2023**.

20. The Court reserves the right to continue the date of the Final Approval and Fairness Hearing without further notice to class members.

///

///

21.     The Court retains jurisdiction to consider all further applications arising from or related to the Settlement Agreement.

IT IS SO ORDERED.

Dated:   **October 25, 2022**

UNITED STATES DISTRICT JUDGE

32