1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10
11
12
13
14
15
16
17

| | |
|---|---|
| RUDY GONZALEZ, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>XTREME MANUFACTURING, LLC, et al.,<br><br>        Defendants. | Case No.: 1:20-cv-1704 JLT SKO<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF THE CLASS SETTLEMENT<br>(Doc. 35)<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEY' FEES, LITIGATION EXPENSES, AND SERVICE PAYMENT<br>(Doc. 36) |

18
19
20
21
22
23
24
25

Rudy Gonzalez asserts Xtreme Manufacturing, LLC, failed to comply with California's wage and hour laws as provided in the California Labor Code, Fair Labor Standards Act, and the Business and Professions Code. (*See generally* Doc. 9.) Gonzalez seeks final approval of a class settlement reached in this action. (Doc. 35.) In addition, Gonzalez seeks attorneys' fees and costs from the settlement fund, costs for settlement administration, and a service payment for the class representative. (Doc. 36.) Xtreme does not oppose these requests, and no class member submitted objections to the settlement terms. The Court found the matters suitable for decision without oral arguments pursuant to Local Rule 230(g), and the hearing for final approval was vacated.

26
27
28

Because Gonzalez carries the burden to demonstrate certification of the Settlement Class is appropriate under Rule 23 of the Federal Rules of Civil Procedure—and the terms of the settlement are fair, reasonable, and adequate—the request for final approval of the Settlement is **GRANTED**. The

request for attorney fees is granted in the amount of **$96,666.67**; costs are awarded in the amount of **$12,897.03**; settlement administration costs are granted in the amount of **$5,500.00**; and Gonzalez's service payment as the class representative is granted in the amount of $**5,000.00**.

## BACKGROUND

Gonzalez was employed by Xtreme as a machinist in the company's facility located in Selma, California, beginning in April 2019. (Doc. 9 at 3, ¶ 8.) Gonzalez asserts he was classified as a non-exempt employee, and as a result he "was entitled to be paid for every hour worked and overtime as appropriate." (*Id.*, ¶ 9.) However, Gonzalez alleges that "Xtreme failed to pay Gonzalez and its other non-exempt employees for all hours they worked." (*Id.*, ¶ 10.)

According to Gonzalez, Xtreme had "issues with… timekeeping, including an inconsistent and unfair rounding policy." (Doc. 9 at 3, ¶ 11.) Gonzalez contends that with the rounding policy, "[he] and Xtreme's other non-exempt employees were routinely credited for less hours than they actually worked." (*Id.*) He asserts, "Xtreme would regularly round his time punch entries in [the company's] favor." (*Id.*, ¶ 12.) For example, Gonzalez alleges that "if [he] clocked in at 6:24 for a 6:30 shift, his time would be rounded to 6:30, but if he clocked out at 3:10, his clock out time would be rounded down to 3:00 p.m." (*Id.*)

Gonzalez asserts that "Xtreme routinely and knowingly edited its employees' time punches to reflect less hours than they actually worked and paid them only according to the altered records." (Doc. 9 at 4, ¶ 13.) He contends, "There were numerous occasions that Gonzalez's managers/ supervisors would physically alter his time punches in order to reduce the time worked and reflect less hours than he actually spent working." (*Id.*, ¶ 14.) He alleges:

> By way of specific example, Gonzalez's time punch records for the period of September 26, 2019 and October 2, 2019 reflect edits to his time entries on each and every day. Those edits were made by Xtreme's managers/ supervisors to reduce the number of hours recorded and thereby the wages paid to Gonzalez.

(*Id.*, ¶ 15.) Gonzalez alleges that "[s]ome of the altered was overtime that should have been paid at overtime premium wages under the FLSA and/or California Labor Code." (*Id.*, ¶ 16.)

Gonzalez alleges Xtreme also violated California law by failing to provide proper meal and rest breaks. (Doc. 9 at 4, ¶ 17.) He asserts, "Xtreme required Gonzalez and its other non-exempt

employees to work through meal and rest breaks due to understaffing and work demands." (*Id.*, ¶ 18.) Gonzalez contends he and other non-exempt employees were frequently not relieved of Xtreme's control during meal and rest breaks. (*Id.*) He alleges that when he and other employees were able to take meal breaks, "they routinely occurred after 5 hours of work." (*Id.*) Gonzalez contends Xtreme "knowingly and intentionally edited Gonzalez and its other non-exempt employees' time punches to reflect meal periods that did not actually occur or did not occur as reported in the altered time records." (*Id.*, ¶ 20.) He asserts the alterations to time punches "further reduc[ed] the amount of work time Gonzalez was paid for (i.e. because meals were inserted that were not taken, [his] time worked was artificially reduced by thirty minutes and wages for that time were not paid)." (*Id.*, ¶ 15.) Gonzalez alleges Xtreme did not pay the premiums required under California law for the failure to provide compliant and mal breaks. (*Id.*, ¶ 22.)

Gonzalez alleges Xtreme "intentionally and willfully failed to reimburse [Gonzalez] and its other non-exempt employees for all necessary expenditures or losses incurred in the direct consequence of the discharge of their job duties in violation of Labor Code section 2802." (Doc. 9 at 5, ¶ 23.) For example, he asserts that Xtreme charged employees for their uniforms. (*Id.*)

According to Gonzalez, Xtreme failed to provide accurate wage statements to the non-exempt employees as a result of the alleged violations of California labor law. (Doc. 9 at 5, ¶ 24.) He contends the wage statements did not accurately identify the gross wages earned, total hours worked, net wages earned, and "[a]ll applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate." (*Id.*) Finally, Gonzalez contends the non-exempt employees "are not timely paid all wages due and owing to them each pay period and at the end of their employment." (*Id.*, ¶ 25.)

In his First Amended Complaint, Gonzalez identified the following causes of action: (1) failure to pay minimum wage, (2) failure to pay overtime, (3) failure to provide meal periods, (4) failure to provide rest periods, (5) failure to reimburse for all business expenses, (6) failure to pay all wages due and owing at the end of employment, (7) failure to provide accurate itemized wage statements, (8) unlawful business practices, (9) civil penalties pursuant to California's Private Attorney General Act, (10) failure to timely provide payroll records, and (11) failure to timely provide personnel records.

1    (Doc. 9 at 1, 9-19.)  Gonzalez asserted the First through Eighth Causes of Action were brought "on

2    behalf of himself and all others similarly situated," with narrowed subclasses defined to address the

3    alleged violations.  (*See id.* at 6.)  Xtreme filed its Answer on March 15, 2021. (Doc. 10.)

4          The Court issued its Scheduling Order governing the action—including any briefing on a

5    motion for class certification—on April 16, 2021.  (Doc. 14.)  The parties engaged in discovery,

6    including both informal information exchanges and propounding written discovery requests.  (Doc.

7    29-1 at 9.)  Gonzalez reports Xtreme produced "critical numerical information, hundreds of pages of

8    policy documents, and comprehensive time and payroll records for 205 Class Members from

9    December 5, 2016 through October 28, 2021."  (*Id.*; *see also* Doc. 29-2 at 3-4, Baysinger Decl. ¶¶ 13-

10   14.)  This produced discovery included "more than 400,000 line items of payroll and time data (each

11   line consisting of multiple data points) relating to [the] putative Class Members."  (*Id.* at 4, ¶ 14.) In

12   addition, counsel "retained a qualified and experienced expert to analyze the data and create a

13   damages model for use during the mediation."  (*Id.* at 4, ¶ 15.)

14         On December 23, 2021, the parties participated in a mediation session with Lou Marlin, Esq.

15   (Doc. 29-1 at 10.)  The mediation session was terminated due to a health emergency, and the parties

16   agreed to resume on February 22, 2022.  (*Id.*)  However, the parties "engaged in numerous substantive

17   discussions—both directly and with the assistance of Mr. Marlin—in the intervening two [] months."

18   (*Id.*)  As a result of the continued discussions, the parties reached an agreement to resolve the matter in

19   principle prior to the scheduled mediation date.  (*Id.*)  The parties executed the "Joint Stipulation of

20   Class and Representative Action Settlement Agreement" in June 2022.  (Doc. 29-2 at 21-42.)

21         Gonzalez filed an unopposed motion for preliminary approval of the settlement, which was

22   granted on October 25, 2022.  (Docs. 29, 31.)  The Court appointed Rudy Gonzalez as the Class

23   Representative and authorized his request for an incentive payment up to $5,000 "subject to a petition

24   and review."  (Doc. 31 at 30.)  In addition, the Court appointed the firm of Mayall Hurley P.C. as Class

25   Counsel.  (*Id.*)  The Court preliminarily granted "Class Counsel's request for fees not to exceed 33

26   1/3% and costs to be determined," noting the requests were also subject to review at the final approval

27   stage.  (*Id.*)  Finally, the Court appointed Simpluris, Inc. as the Settlement Administrator, and

28   authorized costs up to $5,500 for the administration.  (*Id.*)

The Court approved the Class Notice that conveyed this information for Class Members on November 8, 2022.  (Doc. 34 at 1; *see also* Doc. 33 at 4-11.)  The Class Notice informed Class Members of the class approved by the Court, claims and issues to be resolved, representation by counsel, how to be excluded from the class, deadlines for any requests for exclusion and objections, and the binding effect of a class judgment.  (*See* Doc. 33 at 4-11.)

On December 5, 2022, the Settlement Administrator mailed the Class Notice to 218 Class Members.  (Doc. 35-2 at 3, Reyes Decl. ¶ 8.)  Evelyn Reyes, a case manager for the Settlement Administrator, reports that "[i]f a Class Member's Class Notice was returned by the USPS as undeliverable and without a forwarding address, Simpluris performed an advanced address search (i.e. skip trace) on all of these addresses by using Accurint…."  (*Id.*, ¶ 9.)  Ms. Reyes reports, "[t]hrough the advanced address search, Simpluris was able to locate twenty six (26) updated addresses and Simpluris promptly mailed the Notice Packets to those updated addresses."  (*Id.*)  The Settlement Administrator reports only two Notice Packets were undeliverable, which resulted in "a successful mail rate of over 99%."  (*Id.* at 4, ¶ 9.)  No Class Member disputed the number of work weeks identified in their Notice Packets for purposes of calculating each settlement share.  (*Id.*, ¶ 16.)  Further, no objections to the agreement terms were received by either the Settlement Administrator or the Court.  (*See id*, ¶¶ 14-15.)

On November 30, 2020, Gonzalez filed motions for final approval of the settlement, attorneys' fees and costs, a service award for Gonzalez as the Class Representative, and costs of settlement administration.  (Docs. 35, 36.)  Xtreme did not oppose either of the pending motions.

## SETTLEMENT TERMS

Pursuant to the "Joint Stipulation of Class and Representative Action Settlement Agreement" ("the Settlement"), the parties agree to a gross settlement amount of $290,000.00 for the class defined as follows: "all current and former non-exempt California employees of Xtreme who worked at least one shift from December 4, 2016 to March 1, 2022."  (Doc. 35-1 at 21-22, ¶¶ 3, 17.)  The Settlement includes an "escalator clause," under which the gross settlement amount will be increased if the number of Class Members increases by more than 10% over the 219 members estimated at the time of execution or if the verified number of workweeks for the class members increases by more than 5% over the estimated 19,679 workweeks included in the class period.  (Doc. 35-1 at 26, ¶ 44; *see also*

Doc. 35-3 at 8.)  Defendant agrees to pay the gross settlement amount to the Settlement Administrator after final approval of the Settlement.  (*Id.* at 36, ¶ 56.)

## I.      Payment Terms

The gross settlement fund will cover payments to class members with additional compensation to Gonzalez as the class representative.  (Doc. 35-1 at 26-28, Settlement ¶¶ 45-46.)  In addition, the Settlement provides for payments to Class Counsel for attorneys' fees and expenses, to the Settlement Administrator, and the California Labor & Workforce Development Agency.  (*Id.*)  Specifically, the Settlement provides for the following payments from the gross settlement amount:

- The Class Representative will receive an incentive award up to $5,000;

- Class counsel will receive up to $96,666.67 for attorneys' fees, which equals 33 1/3 % of the gross settlement, and litigation expenses up to $14,000;

- The California Labor and Workforce Development Agency shall receive $7,500 from the total PAGA payment of $10,000; and

- The Settlement Administrator will receive up to $5,500 for fees and expenses.

(*Id.* at 26-27, ¶ 45.)  After these payments, the remaining money ("Net Settlement Amount"), which is currently estimated to be $158,888.33, will be distributed to class members.  (*Id.* at 28, ¶ 46.)  If the Court approves payments from the fund that are less than the amounts designated above—including lesser amounts for the class representative, attorneys, the LWDA, or the settlement administrator— the remainder will be "retain[ed] … in the Net Settlement Amount for distribution to Class Members." (*Id.* at 27, Settlement ¶ 45(e).)

Class members are not required to submit a claim to receive a share from the Net Settlement Amount.  (Doc. 35-1 at 26, Settlement ¶ 43; *see also* Doc. 29-1 at 11.)  Class members' shares will be distributed on a *pro rata* basis, based upon the number of weeks worked by Participating Class Members during the applicable Class Period.  (*Id.* at 28.)  Specifically, the Settlement provides:

Payments will be paid from the Net Settlement Amount and paid pursuant to the formula as follows: (i) First, using the Class Data List, the Administrator will compute the total number of workweeks of all Participating Class Members collectively during the Class Period; this sum shall be known as the "Workweek Total;" (ii) Second, the Administrator will divide the Net Settlement Amount by the Workweek Total to determine the settlement value of each eligible Workweek; this shall be known as the "Workweek Value;" (iii) Third, the Administrator

6

> will multiply the number of Workweeks of a Participating Class
> Member during the Class period by the Workweek Value to determine
> the Participating Class Member's Individual Class Settlement Payment.

(Doc. 29-2 at 28, Settlement ¶ 46(a).)  Thus, the exact amount settlement class members receives depends upon how many weeks they worked for Xtreme, and whether they are entitled to a portion allocated for the release of PAGA claims.  However, Gonzalez reports that if the Court approves each of the proposed payments from the gross fund—including the maximum attorney fees and class representative enhancement award under the Settlement—the average settlement share is expected to be $733.65.  (Doc. 35-3 at 11, citing Reyes Decl. ¶¶ 11-12 [Doc. 35-2 at 4].)

The appointed Settlement Administrator will distribute payment by mailing checks to all participating Class Members and Aggrieved Employees.  (Doc. 35-1 at 36, Settlement ¶ 56.)  Checks must be cashed within 180 days of the mailing.  (*Id.*, ¶ 57.)  If any check remains uncashed after the 180-period, the money does not revert to Xtreme.  (*Id.*; *see also id.* at 26, ¶ 43.)  Rather, "the Administrator will void the checks, and transmit the funds to the State of California's Controller, Unclaimed Property Division for further handling on behalf of the Class Member."  (*Id.*)

## II.     Releases

The Settlement provides that Plaintiff and class members, other than those who elect not to participate in the Settlement, release Xtreme[1] from claims arising in the relevant period.  Specifically, the release for class members provides: "As of Effective Date, the Released Parties shall be entitled to a full and final accord, satisfaction, settlement, and release of the Released Claims for the Class Period from Participating Class Members, including Plaintiff."  (Doc. 35-1 at 37, Settlement ¶ 59(a).) The "Released Claims" are defined as:

> all causes of action and claims that were alleged in the Action, or predicate
> claims that reasonably could have been alleged based on the facts and legal
> theories asserted in the Action, which includes all claims alleged in the
> PAGA Letter and all causes of action alleged in the First Amended
> Complaint. This includes, but is not limited to, statutory, constitutional,
> contractual or common law claims for wages, damages, unpaid costs or
> expenses, penalties, liquidated damages, punitive damages, interest,
> attorneys' fees, litigation costs, restitution, or equitable relief, arising out of
> or based upon the allegations in the Action, including the California Labor

---

[1] The Settlement defines "Released Parties" as including "Xtreme Manufacturing, LLC and its past, present and/or future, direct and/or indirect, owners, officers, directors, members, managers, employees, agents, representatives, attorneys, insurers, parent companies, subsidiaries, affiliates, successors, and assigns. (Doc. 35-1 at 25, Settlement ¶ 34.)

Code, the Fair Labor Standards Act, the California Industrial Welfare Commission Wage Orders, and the California Business and Professions Code § 17200, et seq.; including, without limitation, the following categories of allegations, to the fullest extent such claims are releasable by law: (a) all claims for failure to pay minimum wages; (b) all claims for failure to pay overtime wages, including all claims for the alleged omission of any kind of remuneration when calculating an employee's regular rate of pay; (c) all claims for failure to provide compliant meal periods and pay related premiums at the regular rate; (d) all claims for failure to provide compliant rest periods and pay related premiums at the regular rate; (e) all claims for failure to reimburse business expenses; (f) all claims for failure to pay timely current wages and associated penalties; (g) all claims for failure to pay final wages; and (h) all claims for failure to provide accurate wages statements.

(*Id.* at 24, ¶ 33.)  Further, the Settlement provides: "The Class Members understand and agree that this release includes a good-faith compromise of disputed wage claims. The period of the Released Claims shall extend for the Class Period."  (*Id.*)

For individuals who are "aggrieved employees" under PAGA, the released claims include: "all causes of action and claims that were alleged in the Action, or predicate claims that reasonably could have been alleged based on the facts and legal theories asserted in the Action, that seek civil penalties and other relief available pursuant to the PAGA against the Released Parties."  (Doc. 35-1 at 24, Settlement ¶ 28.)  Even if an aggrieved employee opts out of the class settlement, "they will still be bound by the PAGA Release," which covers the period from December 1, 2019 to March 1, 2022.  (*Id.* at 23-24, ¶¶ 26-28.)

The release for Gonzalez encompasses more claims than those identified for Settlement Class Members and the PAGA Members, because he agreed to release any claims that could have arisen during his employment with Xtreme, not just those claims constrained to the facts alleged in this lawsuit.  Specifically, Gonzalez's release provides:

As of the Effective Date, Plaintiff hereby fully and finally releases Defendant and the Released Parties from any and all claims, losses, debts, charges, damages, demands, obligations, causes of action, lawsuits, liabilities, breaches of duty, misfeasance, malfeasance, promises, controversies, contracts, judgments, awards, penalties, costs, and expenses of every nature and description whatsoever, known or unknown, asserted or that might have been asserted, whether in tort, contract, or for violation of any local, state, or federal statute, rule, regulation, ordinance or common law, including but not limited to those claims raised in the Action and/or that could have been raised in the Action, and those arising from or related to Plaintiff's employment with Defendant, and the termination of that employment ("Plaintiff's Released Claims"). Plaintiff's Released

8

Claims includes all of the Released Claims as defined herein as well as all other wage and hour claims, claims under California Business and Professions Code section 17200, claims under the Labor Code, including, but not limited to, claims under the PAGA, claims under the Fair Labor Standards Act, and all claims for indemnity or reimbursement of business expenses, overtime compensation, minimum wages, penalties, liquidated damages, and interest, as well as all other claims under state, federal, and local laws, including, without limitation, Title VII of the Civil Rights Act of 1964, the Family Medical Leave Act, the Americans with Disabilities Act, the Fair Credit Reporting Act, the Employee Retirement Income Security Act of 1974, and all of their implementing regulations and interpretive guidelines, as well as the common law, including laws related to discrimination, harassment, or retaliation, arising from or relating to Plaintiff's relationship, or termination of relationship, with any Released Party through the Effective Date for any type of relief. Plaintiff further covenants that he will not become a member of any other legal actions against the Released Parties, as that term is defined, asserting any of Plaintiff's Released Claims, and will opt out of any such actions if necessary.

(Doc. 35-1 at 37, Settlement ¶ 59(c).) Thus, claims released by Gonzalez—but not the Settlement Class—include any claims arising under the Americans with Disabilities Act, Title VII, 42 U.S.C. § 1981, and the Employee Retirement Income Security Act. Indeed, the Settlement indicates: "For the avoidance of doubt, this is a complete and general release to the maximum extent by law, and this release excludes only the release of claims not permitted by law." (*Id.*)

### III.    Objections and Opt-Out Procedure

The "Notice of Settlement of Class and Representative Action" explained to Class Members they "do not need to do anything to receive a Settlement Payment." (Doc. 35-1 at 47.) However, any class member who wished had an opportunity to file objections to the terms or request exclusion from the Settlement Class. (*Id.* at 31-33, Settlement ¶ 50.) The Class Notice explained the procedures to object to the terms and/or request exclusion. (Doc. 35-2 at 8-9, 11-12.) Individuals were informed any objections or requests for exclusion were to be postmarked no later than January 19, 2023.[2] (*Id.* at 8; *see also id.* at 4, Reyes Decl. ¶ 13.)

### IV.    Service of the Class Notice Packets and Responses Received

Evelin Reyes, a case manager for the Settlement Administrator, reports the Notice was mailed to 218 Class Members via the United States Postal Service on December 5, 2022. (Doc. 35-2 at 2-3,

---

[2] The deadline for Class Members who received a re-mailed Notice was extended to February 8, 2023. (Doc. 36-1 at 9; *see also* Doc. 35-2 at 5, Reyes Decl. ¶ 13.)

1   Reyes Decl. ¶¶ 1, 8.)  She reports that no Class Member disputed the number of work weeks identified

2   in their notice, which was given for purposes of calculating each settlement share.  (*Id.* at 4, ¶ 16.)  Ms.

3   Reyes also reports the Settlement Administrator did not receive any requests for exclusion or

4   objections from Class Members.  (*Id.* at 4, ¶¶ 14-15.)  Likewise, the Court did not receive any

5   objections to the Settlement.

6                          **APPROVAL OF A CLASS SETTLEMENT**

7            When parties settle the action prior to class certification, the Court has an obligation to "peruse

8   the proposed compromise to ratify both the propriety of the certification and the fairness of the

9   settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Approval of a class settlement is

10  generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem*

11  *Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). Second, the Court must "determine whether the

12  proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler*

13  *Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within

14  the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

15  **I.        Certification of a Settlement Class[3]**

16           Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

17  provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

18  of all."  Fed. R. Civ. P. 23(a).  Parties seeking class certification bear the burden of demonstrating the

19  elements of Rule 23(a) are satisfied, and "must affirmatively demonstrate … compliance with the

20  Rule."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell,*

21  *Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court

22  must consider whether the class is maintainable under one or more of the three alternatives set forth in

23  Rule 23(b).  *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

24           Under the terms of the Settlement, the class is defined as: "all current and former non-exempt

25  California employees of Xtreme who worked at least one shift from December 4, 2016 to March 1,

26  2022."  (Doc. 35-1 at 21, Settlement ¶ 3.)  Gonzalez contends this proposed Settlement Class satisfies

27

28  ---
[3] Because the class was only conditionally certified upon preliminary approval of the Settlement, final certification of the Settlement Class is required.

the requirements of Rule 23(a) and (b), and "certification in the context of final approval is… proper." (Doc. 35-3 at 13.)

### A.     Rule 23(a) Requirements

The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147, 155-56 (1982).  Certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These prerequisites are generally referred to as numerosity, commonality, typicality, and adequacy of representation.  *Falcon*, 457 U.S. at 156.

#### 1.     Numerosity

This prerequisite requires the Court to consider "specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is not a specific threshold, joining more than one hundred plaintiffs is impracticable.  *See Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) (finding the requirement "satisfied solely on the basis of the number of ascertained class members"); *Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n.7 (9th Cir. 1977) (a proposed class with 110 members "clearly [included] a sufficient number to meet the numerosity requirements").  Gonzalez reports there are "218 Participating Class Members."  (Doc. 35-3 at 13.)  Therefore, joinder of all identified Class Members is impracticable, and the numerosity requirement is satisfied.

#### 2.     Commonality

Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy the commonality requirement, the plaintiff must demonstrate common points of facts and law.  *See Wal-Mart Stores*, 564 U.S. at 350.  Thus, "commonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact

1  that are apt to drive the resolution of the litigation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581,

2  588 (9th Cir. 2012) (internal quotation marks, citations omitted).

3  Gonzalez asserts the commonality requirement is satisfied because "the claims of Gonzalez and

4  the Class Members all flow from a 'common core of salient facts'…" (Doc. 35-3 at 14.) Specifically,

5  Gonzalez contends common factual and legal issues include:

> Defendant's alleged uniform practice of requiring its Selma warehouse
> workers to work off-the-clock without compensation because managers
> intentionally fail to accurately record all time worked and/or they modify
> employee time records (JDB Dec. ¶ 48), uniform policy of not providing
> meal periods (particularly second meal periods), both because the written
> policy misadvised employees they could waive a second meal period
> under all circumstances and because they effectively required employees
> to acknowledge being afforded all meal periods even when such was not
> the case (JDB Dec. ¶ 50, Exhs. 3-5), uniform policy of not giving credit to
> the "major fraction" thereof language with respect to rest periods and
> thereby denying rest periods (JDB Dec. ¶ 52, Exh. 3), resultant failure to
> timely pay all wages due and owing at separation or provide uniform
> itemized wage statements missing critical necessary information required
> by Labor Code section 226(a)(2), and uniform practice of requiring
> employees to purchase their own uniforms (JDB Dec. ¶ 36).

14  (*Id.*, citing Baysinger Decl. [Doc. 35-1].) Gonzalez contends the common questions include:

> determining 1) whether managers at the Selma location routinely advised
> employees they would clock them out, but instead failed to accurately
> enter the work stop time (entering the scheduled shift time instead), 2)
> whether Xtreme's meal period policy misinformed employees they could
> waive their second meal periods, 3) whether Xtreme's practice of
> requiring a mandatory waiver of second meal periods is unlawful, 4)
> whether Xtreme's written policy failed to give effect to the timing
> requirements for rest periods, and 5) whether Xtreme regularly did not
> reimburse employees for masks, boots, and uniforms will resolve the
> liability issues underscoring the Class Claims.

21  (*Id.* at 15.) Because it appears resolution of the identified issues—such whether Xtreme's practices and

22  policies violated California wage and hour law—apply to the claims of each of the Class Members, the

23  Court finds the commonality requirement is satisfied for purposes of settlement.

24           3.     Typicality

25  This requirement demands that the "claims or defenses of the representative parties are typical

26  of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A claim or defense is not required to

27  be identical, but rather "reasonably coextensive" with those of the absent class members. *Hanlon*, 150

28  F.3d at 1020. "The test of typicality is whether other members have the same or similar injury, whether

the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks, citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

Gonzalez contends his "claims are typical of the claims of the Class because they arise from the same factual basis and are based upon the same legal theories." (Doc. 35-2 at 15, citing *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 644 (N.D. Cal. 1987).) Gonzalez reports he worked a machinist in the company's facility located in Selma, California, beginning in April 2019. (Doc. 9 at 3, ¶ 8.) He also asserts that he was classified as a non-exempt employee. (*Id.*) As such, Gonzalez "was subjected to the same unlawful policies, practices, and procedures," including: (1) being "underpaid because of Defendant's failures to pay for all hours actually worked (primarily because of time entry edits)," (2) the failure "provide meal and rest periods and associated premiums" (3) receiving inaccurate wage statements, (4) the failure to timely pay "all wages due and owing upon separation," and (5) the failure to reimburse all business expenses. (Doc. 35-1 at 15-16, Baysinger Decl. ¶ 70.) Because Gonzalez was subjected to the same company policies and payment procedures as the class members—and Xtreme does not dispute this— the Court finds the typicality requirement is satisfied for purposes of settlement. *See Hanon*, 976 F.2d at 508; *Kayes*, 51 F.3d at 1463.

#### 4.    Fair and Adequate Representation

This prerequisite is satisfied if the representative party "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

##### a.    Class representative

Jenny Baysinger, counsel for Gonzalez and the class, asserts that Gonzalez "has demonstrated his commitment to prosecuting this Class Action on behalf of the Class Members." (Doc. 35-1 at 16,

Baysinger Decl. ¶ 71.)  Tasks undertaken by Gonzalez included: "locating and retaining attorneys, participating in discovery and investigation, filing this action and willingly exposing his name and reputation to detriment by filing the Class Action, and helping to facilitate the Settlement for which approval is now sought, including participating in and being available throughout the entire remote mediation process."  (*Id*.)

Neither party identified conflicts between Gonzalez and the Settlement Class members.  (*See* Doc. 35-1 at 15, ¶ 70.)  Based upon the information provided, Gonzalez has actively endeavored to prosecute claims on behalf others similarly situated.  Moreover, the interests of Gonzalez are aligned with those of the class members: to maximize the recovery for the alleged violations of California wage and hour laws.  Thus, it appears Gonzalez has fairly and adequately represented the interests of the Settlement Class.

### b.      Class counsel

The law firm of Mayall Hurley P.C. has extensive experience litigating employment class actions and serving as class counsel.  Ms. Baysinger reports she began practicing law in 2007, and Robert Wasseman has been practicing since 2008.  (Doc. 36-2 at 19-20, Baysinger Decl. ¶¶ 80, 85.) Ms. Baysinger reports the firm "represented plaintiffs in numerous representative employment actions, settlements in which have been approved by multiple California and federal courts, and are currently prosecuting dozens more."  (*Id.* at 18, ¶ 74.)  She identified more than forty "wage-and-hour class actions with claims similar to the instant matter" in which "Mayall Hurley P.C. has recently been approved as class counsel."  (*Id.* at 16-18, ¶ 74; *see also* Doc. 36-2 at 20-22, ¶ 86.)

Xtreme did not oppose the appointment of the Class Counsel, or assert the attorneys were inadequate to represent the interest of the class for purposes of the pending settlement.  The described litigation experience supports a conclusion that counsel prosecuted the action vigorously on behalf of the Settlement Class.  Thus, the Court finds Mayall Hurley P.C. satisfies the adequacy requirement.

### B.      Certification of a Class under Rule 23(b)(3)

For the foregoing reasons, the prerequisites of Rule 23(a) are satisfied by the Settlement Class. However, a class may only be certified if it is also maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266.  Gonzalez asserts certification of the proposed settlement

14

1  class is appropriate under Rule 23(b)(3).  (Doc. 35-3 at 16-17.)

2       Under Rule 239(b)(3), a class is maintainable if (1) "questions of law or fact common to the

3  members of the class predominate over any questions affecting only individual members" and (2) "a

4  class action is superior to other available methods for fair and efficient adjudication of the

5  controversy."  Fed. R. Civ. P. 23(b)(3).  These are referred to as the "predominance" and "superiority"

6  requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart Stores*, 564 U.S. at 363 ("(b)(3)

7  requires the judge to make findings about predominance and superiority before allowing the class").

8                    1.    Predominance

9       The predominance inquiry focuses on "the relationship between the common and individual

10 issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by

11 representation."  *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  "[A] central

12 concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help

13 achieve judicial economy.'" *Vinole v. Countrywide Home Loans,* 571 F.3d 935, 944 (9th Cir. 2009)

14 (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

15      Gonzalez contends the predominance requirement is satisfied because "the policies and

16 practices alleged to underscore the Class Claims apply class-wide and Defendant's liability can be

17 determined by facts, and applicable law, common to all Class Members…."  (Doc. 35-3 at 16.)  Based

18 upon the information provided and allegations presented in the First Amended Complaint, the Court

19 finds adjudication of the claims via a class action promotes judicial economy, because the claims are

20 based upon company, class-wide policies and procedures.

21                    2.    Superiority

22      The superiority inquiry requires a determination of "whether objectives of the particular class

23 action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted).

24 This tests whether "class litigation of common issues will reduce litigation costs and promote greater

25 efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)  Pursuant to Rule

26 23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior

27 method of adjudication, including (1) interests of class members, (2) other pending litigation, (3) the

28 desirability of concentrating claims in one forum, and (4) difficulties with the management of the class

1    action.  *Id.; see also James v. Uber Techs. Inc.*, 338 F.R.D. 123, 143 (C.D. Cal. 2021) (indicating the

2    factors identified in Rule 12(b)(3) address the "superiority" analysis).

3                              *a.      Class members' interest in individual litigation*

4            The Court is directed to consider "the class members' interests in individually controlling the

5    prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  This factor is most relevant

6    when class members "suffered sizeable damages or [have] an emotional stake in the litigation."

7    *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 301 (C.D. Cal. 2011).  The Ninth Circuit explained

8    that "[w]here damages suffered by each putative class member are not large, this factor weighs in

9    favor of certifying a class action."  *Zinser*, 253 F.3d at 1190.

10           The Settlement Administrator reports there were no requests for exclusion or objections.  (Doc.

11   35-2 at 4, Reyes Decl. ¶¶ 14-15.)  Thus, there is no indication any Class Members desire to control this

12   action or proceed with individual litigation.  The anticipated payments to Class Members are not

13   particularly large, as the estimated average payment is $733.65, and the highest payment is $2,226.55.

14   (*Id.*, ¶ 12.)  It is unlikely that individuals would pursue such small claims. *See Zinser*, 253 F.3d at 1190;

15   *Thieriot v. Celtic Ins. Co.*, 2011 WL 1522385, at *4 (N.D. Cal. Apr. 21, 2011) (noting the average

16   payment of $2,462 was "relatively small[]" and supported a finding the class action was a superior to

17   individual cases).  As this Court previously observed: "When the individual claims of class members

18   are small, the class action facilitates the spreading of the litigation costs among the numerous injured

19   parties." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, (E.D. Cal. 2013) (internal quotation

20   marks, citation omitted).  Thus, the factor weighs in favor of certification.

21                              *b.      Other litigation*

22           Next, the Court considers "the extent and nature of any litigation concerning the controversy

23   already begun by or against class members."  Fed. R. Civ. P. 23(b)(3)(B).  The parties have not

24   identified any other litigation related to the claims addressed raised by Gonzalez or encompassed in

25   this Settlement.  Therefore, this factor weighs in favor of class certification.

26                              *c.      Concentration in one forum*

27           Third, the Court must consider "the desirability or undesirability of concentrating the litigation

28   of the claims in the particular forum."  Fed. R. Civ. P. 23(b)(3)(C).  There is no suggestion the Eastern

1  District is an undesirable forum for the matter, which raises wage and hour claims under California

2  law on behalf of employees throughout the state.  *See United States ex rel. Terry v. Wasatch*

3  *Advantage Grp., LLC*, 327 F.R.D. 395, 419 (E.D. Cal. 2018) (finding the factor weighed in favor of

4  certification where the proposed class was compromised of individuals located in California and

5  involved "California state law claims").  Moreover, as this Court previously explained, when "parties

6  … agreed on a proposed Settlement Agreement, the desirability of concentrating the litigation in one

7  forum is obvious."  *Wright v. Linkus Enters.*, 259 F.R.D. 468, 474 (E.D. Cal. 2009) (internal quotation

8  marks, citation omitted).  Therefore, this factor weighs in favor of certification.

9                                         d.       *Management of the action*

10         Finally, the Court must consider "the likely difficulties in managing a class action."  Fed. R.

11  Civ. P. 23(b)(3)(D).  The Supreme Court explained that, in general, "manageability … encompasses

12  the whole range of practical problems that may render the class format inappropriate for a particular

13  suit."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  Because the parties reached an

14  agreement for the class claims and identified the Settlement Class, it does not appear there are any

15  problems with managing the action.  *See Espinosa v. Ahearn*, 926 F.3d 539, 556-57 (9th Cir. 2019)

16  ("manageability is not a concern in certifying a settlement class where, by definition, there will be no

17  trial"); *see also Spann v. J.C. Penney Corp.*, 214 F.R.D. 312, 318 (C.D. Cal. 2016) ("settlement

18  obviates the need for a manageable trial").  Further, the Court need not speculate as to manageability if

19  the case proceeded to trial.  *See Amchem Prods.*, 521 521 U.S. at 620 ("with a request for settlement-

20  only class certification, a district court need not inquire whether the case, if tried, would present

21  intractable management problems").  Consequently, this factor weighs in favor of certification.

22  **II.      Evaluation of the Settlement Terms**

23         Settlement of a class action requires approval of the Court, which may be granted "only after a

24  hearing and on finding that [the settlement] is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

25  Approval is required to ensure settlement is consistent with the plaintiff's fiduciary obligations to the

26  class.  *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  Toward that end,

27  "Congress and the Supreme Court amended Rule 23(e) to set forth specific factors to consider in

28  determining whether a settlement is 'fair, reasonable, and adequate.'"  *Briseño v. Henderson*, 998 F.3d

1014, 1023 (9th Cir. 2021); *see* Fed. R. Civ. P. 23(e)(2) (effective Dec. 1, 2018).  Rule 23(e)(2) now

directs the Court to consider whether:

> (A) the class representatives and class counsel have adequately represented
> the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of distributing relief to
> the class, including the method of processing class-member claims;
> (iii) the terms of any proposed award of attorney's fees, including
> timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *see also Briseño*, 998 F.3d at 1023-24.  The Ninth Circuit determined this

revision to Rule 23 requires courts "to go beyond [its] precedent." *Briseño*, 998 F.3d at 1026.[4]

## A.     Representation of the Class

To determine adequacy of representation under Rule 23(e)(2), the Court may consider whether

the interests of the named plaintiff are "aligned with the interests of the Class Members." *See Cottle v.*

*Plaid Inc.*, 240 F.R.D. 356, 376 (N.D. Cal. 2021).  In addition, a finding that "Class Counsel are

experienced and competent" supports a conclusion that the class is adequately represented. *Id.; see*

*also In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent

counsel are better positioned than courts to produce a settlement that fairly reflects each party's

expected outcome in litigation.").  Thus, the adequacy analysis under Rule 23(e)(2) is "redundant of

the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *Mandalevy v. Bofi Holding, Inc.*,

2022 WL 1556160, at *6 (S.D. Cal. May 17, 2022) (quoting 4 William B. Rubenstein, Newberg on

Class Actions § 13:48 (5th ed. 2020)).

---

[4] Previously, the Ninth Circuit had identified several factors to determine whether a settlement agreement meets these standards, including:

> the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further
> litigation; the risk of maintaining class action status throughout the trial; the amount offered in
> settlement; the extent of discovery completed, and the stage of the proceedings; the
> experience and views of counsel; the presence of a governmental participant; and the reaction
> of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (citation omitted).  Although Plaintiff refers to the factors under the Ninth Circuit precedent (Doc. 75 at 22-23), the Court focuses its analysis on the factors enumerated in Rule 23. *See Briseño*, 998 F.3d at 1026; *see also Herrera v. Wells Fargo Bank, N.A.*, 2021 U.S. Dist. LEXIS 170195, at *21 (C.D. Cal. June 8, 2021) ("The goal of [amended Rule 23(e)] is … to focus the [district] court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal") (quoting Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes).

Gonzalez's interests appear aligned with those of class members, as they share a common interest in challenging the alleged wrongful wage and hour policies.  In addition, Class Counsel are clearly experienced in class action litigation.  (*See* Doc. 35-3 at 16-18, ¶ 74; *see also* Doc. 36-2 at 20-22, ¶ 86.)  Because Gonzalez carried the burden to show the adequacy prerequisite was satisfied under Rule 23(a), the Court finds the requirement under Rule 23(e)(2) is also satisfied.  *See Flores v. Dart Container Corp.*,  2021 WL 1985440, at *5 (E.D. Cal. May 17, 2021) ("Because the Court has found that the proposed class satisfies Rule 23(a)(4) for purposes of class certification, the adequacy factor under Rule 23(e)(2)(A) is also met").

## B.      Negotiation of the Settlement

Under Rule 23, the Court must consider whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).  The Ninth Circuit also "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in evaluating a proposed class action settlement. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009).  The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others.  *Staton*, 327 F.3d at 960.  The Ninth Circuit observed that "settlement class actions present unique due process concerns for absent class members" because the "inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks, citations omitted).  Thus, the Court must consider whether the settlement is truly the product of arm's length bargaining—as Gonzalez asserts (Doc. 35-3 at 7, 10)— or if the agreement is the product of collusion or fraud.  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).

When a class action settlement agreement is reached prior to a class being certified, district courts must be watchful "not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 94; *see also Briseño*, 998 F.3d at 1023.  These "more subtle signs" include: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply

19

rewarded"; (2) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds" and "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (internal quotations, citations omitted).

### 1.    Whether there is a disproportionate distribution to counsel

The Settlement provides that Class counsel may request attorneys' fees up to $96,666.67, which is one third of the gross settlement fund.  (Doc. 35-1 at 21, Settlement ¶ 5.)  The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark.  *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).  Because the fees requested are within the range awarded by the Ninth Circuit, the Court finds the Settlement Agreement does not provide a disproportionate distribution to Class Counsel.  *See Millan v. Casvade Water Servs.*, 310 F.R.D. 593, 612 (E.D. Cal. 2015) (finding no disproportionate distribution where class counsel was to receive a third of the settlement fund "although significantly above the benchmark for this Circuit," because it was "not unreasonable as an upper bound" of fees awarded in the Circuit).

### 2.    Existence of a "clear sailing" agreement

In general, a "clear sailing" provision is one in which the parties agree to the "payment of attorneys' fees separate and apart from class funds." *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d at 947. However, the Ninth Circuit recognized also a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorneys' fees up to an agreed upon amount. *Lane*, 696 F.3d at 832; *In re Bluetooth Headset Prods.*, 654 F.3d at 947.

Xtreme agreed the company "will not oppose requests for a Class Counsel Fees Payment and Class Counsel Litigation Expenses Payment consistent with this Agreement and approved by the Court."  (Doc. 35-1 at 27, Settlement ¶ 45(b).)  Thus, the Settlement includes a version of a "clear sailing agreement."  Nevertheless, the existence of a clear sailing provision is not necessarily fatal to approval.  *See In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d at 948; *see also In re Toys R Us-Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig*., 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("a clear sailing agreement is one where the party paying the fee agrees not to contest the

1   amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling").

2   Rather, "when confronted with a clear sailing provision, the district court has a heightened duty to peer

3   into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the

4   class." *Id.* (citing *Staton*, 327 F.3d at 954).

5      As discussed below, the Court finds an award from the common fund is appropriate and the

6   fees to be awarded are reasonable in light of the work completed and results obtained.  This factor

7   does not mandate a finding of collusion and the factor does not weigh against final approval of the

8   settlement. *See Singh v. Roadrunner Intermodal Servs. LLC*, 2019 WL 316814 at *7-8 (E.D. Cal. Jan

9   24, 2019) (not finding collusion between the parties, despite a clear sailing agreement, where the fee

10  award was analyzed and determined to be reasonable).

11        3.  Whether there is a reversion to Defendant

12     Finally, the parties did not arrange for unawarded fees to revert to Xtreme.  Instead, the parties

13  acknowledge in the Settlement Agreement that the Court may approve less than the requested amount

14  of fees, in which case the unawarded fees will be retained "in the Net Settlement Amount for

15  distribution to Class Members."  (Doc. 35-1 at 27, Settlement ¶ 45(e).)  Because unawarded fees will

16  be distributed to participating class members, this factor does not support a finding of collusion.

17        4.  Findings on collusion

18     Based upon the factors set forth by the Ninth Circuit, the Court finds the proposed settlement

19  "appears to be the product of serious, informed, non-collusive negotiations."  *See In re Tableware*

20  *Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007).  Thus, this factor under Rule 23

21  supports final approval of the class settlement.

22    **C.**  **Relief provided to the Class**

23     The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of

24  absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Commission*, 688

25  F.2d 615, 624 (9th Cir. 1982) (citation omitted).  When analyzing an agreement, the Court should

26  examine "the complete package taken as a whole," and the proposed settlement is "not to be judged

27  against a hypothetical or speculative measure of what *might* have been achieved by the negotiators."

28  *Officers for Justice*, 688 F.2d at 625, 628.

Class Counsel report that "Xtreme's exposure for damages and statutory penalties based on the Class Claims was calculated at $1,996,448.76." (Doc. 35-1 at 8, Baysinger Decl. ¶ 37; *see also id.* at 6-8, ¶¶ 27-36.) However, Ms. Baysinger notes that "100% success in litigation is unrealistic," and Class Counsel endeavored to calculate the "realistic recoverable damages/statutory penalties" against Xtreme. (*Id.* at 8-9, ¶¶ 41, 42.) Ms. Baysinger reports:

> Class Counsel (1) applied a 25% discount to the off-the-clock claim due to the inherent difficulty in demonstrating that off-the-clock work has occurred and certifying such claims, leaving $254,319.12. *Vasquez v. Crane Cartage, LLC*, 2020 WL 4547444 *3 (E.D. Cal. 2020); *In re Wells Fargo Loan Processor Overtime Pay Litigation*, 2011 WL 3352460 *6 (N.D. Cal. 2011); (2) applied a 75% discount to the meal period claim to account for the fact that a) the vast majority of the presumptively missed meal periods were second meal periods and b) Xtreme generally obtained written second meal period waivers from Gonzalez and other Class Members that would render most of those presumptive violations inapplicable/non-compensable, leaving $64,082.75 (3) applied a 75% discount to the rest period claim to account for the likely event that some of the breaks that were missed were voluntarily foregone by the Class Member and because the written waivers Gonzalez was required to execute purport to acknowledge all rest breaks were taken (thus making proving damages for missed meal periods extremely difficult) resulting in $107,280.50, (4) applied a 50% discount to the waiting time penalty claim to account for the potential that some of the Class Members who are also former employees would be unable to demonstrate any compensable wages that were actually unpaid during employment and Defendant's anticipated argument that its failure to pay any meal premium wages was not willful and the law was unsettled at the time of the non-payments (*Naranjo v. Spectrum Security Svcs.*, Inc., 13 Cal.5th 93, 102 (Cal. 2022)), leaving $301,276.80, (5) applied a 50% discount to the wage statement claim to account for the potential that injury could not be demonstrated due to the wholly derivative nature of the alleged deficiencies in the wage statements and/or Gonzalez lacks Article III, leaving $162,875, and (6) applied no discount to the reimbursement claim ($43,600).

(*Id.* at 8-9, ¶ 41.) With the identified discounts, Class Counsel estimated the "realistic recovery" totaled $933,434.17. (*Id.* at 9, ¶ 42.) Thus, the portion of the gross settlement fund allocated to the class claims—totaling $280,000—represents approximately 30% of the "realistic recovery." (*Id.*, ¶ 43.)

Notably, the Ninth Circuit observed: "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459. This Court previously observed that a settlement amount equaling approximately 30% of the estimated potential damages was reasonable. *See, e.g., Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D 443, 444 (E.D. Cal. 2013) (finding the recovery of

approximately 30% was "a reasonable compromise" and supported approval of the settlement).  Thus, the percentage recovered on behalf of the class members—which appears to be 30% of the "reasonable recovery" or 14% of the *maximum* possible recovery— does not weigh against approval of the Settlement.  *See id.; see also Benitez v. Western Milling, LLC*, 2020 WL 309200, at *8 (E.D. Cal. Jan. 21, 2020) (observing that a recovery rate of 30% for "the plaintiffs' primary claims"— even when the percentage was reduced to 13% when PAGA penalties were added—was "consistent with percentage recoveries California district courts have found to be reasonable"); *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (finding the gross settlement of approximately 15% of the potential recovery was fair).

After the anticipated deductions from the gross fund, the Settlement Administrator expects that that $159,936.30 will be dispersed to Participating Class Members.  (Doc. 35-2 at 4, Reyes Decl. ¶ 12.) The Settlement Administrator estimates the average payment for Class Members is $733.65 and the highest payment will be $2,227.55.  (*Id.*)  Analyzing the factors identified in Rule 23—as discussed below—the Court finds the amount offered and relief provided to the Settlement Class supports final approval of the Settlement.

### 1.    Costs, risks, and delays

A "central concern" evaluating a proposed class settlement "relate[s] to the cost and risk involved in pursuing a litigated outcome."  *Feltz v. Cox Comm's Cal., LLC*, 2022 WL 2079144 at *9 (C.D. Cal. Mar. 2, 2022), quoting Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes [modification in original].)  Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the settlement were to be rejected, the parties would have to engage in further litigation, including seeking class certification and discovery on the issue of damages.

The parties agree the claims are "highly disputed."  (Doc. 35-1 at 39, Settlement ¶ 63)(a)(i).)  In the Settlement Agreement, the parties indicated: "Defendant and the Released Parties deny that they have engaged in any unlawful activity, have failed to comply with the law in any respect, have any liability to anyone under the claims asserted in the Action, or that but for the Settlement a class should be certified in the Action."  (*Id.*)  Gonzalez observes:

1

2

3

4

5

6

> Defendant asserts and would have continued to assert numerous legal and factual grounds to defend against each of the Class Claims and/or certification of such claims, including, but not limited to, 1) that the "off-the-clock" claim lacks merit, 2) that its meal and rest period policies are facially lawful, 3) that, even if facially unlawful, there were no meal/rest period violations as evidenced by the acknowledgments routinely signed by Class Members, 4) that the UCL claim cannot proceed because of *Sonner* [*v. Premier Nutrition*, 971 F.3d 834, 845 (9th Cir. 2020)], 5) that Gonzalez did not suffer any injury from the derivative wage statement violations, and 6) that any failure to pay waiting time penalties was not sufficiently "willful" to justify their imposition.

7

8

9

(Doc. 35-3 at 20.)  Gonzalez contends that "continued litigation was guaranteed to be costly, time consuming, and uncertain in outcome."  (*Id.*)  However, "the Settlement ensures timely relief and substantial monetary relief" for Class Members.  (*Id.*)

10

11

12

13

14

15

16

17

18

19

20

21

Notably, employment law class actions are, by their nature, time-consuming and expensive to litigate. *Hightower v. JPMorgan Chase Bank, N.A.*, 2015 WL 9664959 at *6 (C.D. Cal. Aug. 4, 2015). If the Settlement is rejected, the parties would have to engage in further litigation, including seeking class certification and discovery on the issue of damages.  The time and expense of continued litigation could outweigh any additional recovery.  On the other hand, the proposed settlement provides for immediate recovery on claims presented by Gonzalez on behalf of the class.  Due to the acknowledged disputed liability, risk of the claims of class members, costs of future litigation that may reduce the recovery to class members, and delay in payments if the settlement is not approved, this factor weighs in favor of final approval of the Settlement.  *See Rodriguez*, 563 F.3d at 966 (risk, expense, complexity and duration of litigation supports settlement); *see also Pena v. Taylor Farms Pacific, Inc.*, 2020 WL 6392576, at *8 (E.D. Cal. Nov. 2, 2020) ("settlement avoids the risks, expense and delay of litigation").

22

### 2.    Proposed distribution

23

24

25

26

27

28

"[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible."  *Hilsley v. Ocean Spray Cranberries, Inc.*, 2020 WL 520616 at *7 (S.D. Cal. Jan. 31, 2020) (citing "Final approval criteria—Rule 23(e)(2)(C)(ii): Distribution method," 4 Newberg on Class Actions § 13:53 (5th ed.)). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes.  The

1   proposed method for processing claims "should deter or defeat unjustified claims, but the court should

2   be alert to whether the claims process is unduly demanding." *Id*.

3          Class Members are not required to take any action, such as submitting a claim form, to receive

4   their settlement payment.  (Doc. 35-2 at 22, Settlement ¶ 9 [indicating the settlement payment would

5   "be received without the need to return a claim form"]; *see also id.* at 26, ¶ 43 ["the Gross Settlement

6   Amount will be disbursed pursuant to this Agreement without the need to submit a claim form"].)

7   Rather, Class Members only needed to take action if they wish to opt-out of the settlement, object to

8   any of the terms, or dispute the number of workweeks identified to calculate their individual

9   settlement share.  Because submission of a claim form is not required, the proposed method of

10  distribution is not "unduly demanding" upon Class Members and will facilitate payment for legitimate

11  claims.  Thus, this factor weighs in favor of final approval of the settlement. *See Jackson v. Fastenal*

12  *Co.*, 2021 WL 5755583 at *11 (E.D. Cal. Dec. 3, 2021) (finding "the proposed method of distributing

13  relief is effective, and weighs in favor of a finding that the settlement agreement is fair, reasonable and

14  adequate" where the class members did not have to file a claim).

15          3.      Attorneys' fees

16          When evaluating the terms of a settlement, "courts must scrutinize 'the terms of any proposed

17  award of attorney's fees.'"  *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 607 (9th Cir. 2021)

18  (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii).  The Ninth Circuit explained, "the new Rule 23(e) makes

19  clear that courts must balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for

20  the class' in determining whether the settlement is 'adequate' for class members." *Id.*, quoting

21  *Briseño*, 998 F.3d at 1024.

22          As discussed above, Class Counsel may request fees in the amount of one-third of the gross

23  settlement.  (Doc. 35-1 at 27, Settlement ¶ 45(b).)  The fees to which the parties agreed are within the

24  range of acceptable fees in the Ninth Circuit.  *See Powers*, 229 F.3d at 1256.  The Court-approved

25  payment shall be made by the out of the Gross Settlement Amount by the Settlement Administrator

26  within 14 days of Xtreme providing the funds to the Settlement Administrator.  (*Id.* at 36, ¶ 56.)  In that

27  same 14-day period, the Settlement Administrator will issue the other approved payments, including to

28  Class Members.  (*Id.*)  Thus, Class Counsel will receive their payment in the same period of time as

1   Class Members.  The amount of fees and the timing of payment do not weigh against final approval of

2   the Class Settlement.

3                      4.      Agreement required to be identified

4          The Court must consider any agreement that is required to be identified under Rule 23(e)(3).

5   Fed. R. Civ. P. 23(e)(2)(C)(iv).  Specifically, "parties seeking approval must file a statement identifying

6   any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(3).  The parties have

7   identified no such agreement and the Court is not aware of any such agreement.  Thus, this factor does

8   not weigh against preliminary approval.

9          **D.     Treatment of Class Members**

10         Rule 23 requires the Court to consider whether the proposed settlement "treats class members

11  equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  "A distribution of relief that favors some

12  class members at the expense of others may be a red flag that class counsel have sold out some of the

13  class members at the expense of others, or for their own benefit."  *Hilsley*, 2020 WL 520616 at *7

14  (citation omitted).

15         The parties agreed that Class Members who did not request exclusion from the Settlement Class

16  will receive a *pro rata* share of the Net Settlement Amount, calculated with the following formula:

17             (i) First, using the Class Data List, the Administrator will compute the
               total number of workweeks of all Participating Class Members
18             collectively during the Class Period; this sum shall be known as the
               "Workweek Total;" (ii) Second, the Administrator will divide the Net
19             Settlement Amount by the Workweek Total to determine the settlement
               value of each eligible Workweek; this shall be known as the "Workweek
20             Value;" (iii) Third, the Administrator will multiply the number of
               Workweeks of a Participating Class Member during the Class period by
21             the Workweek Value to determine the Participating Class Member's
               Individual Class Settlement Payment.
22

23  (Doc. 35-3 at 28, ¶ 46(a).)

24         Because the Settlement provides *pro rata* distribution to Class Members based upon their

25  number of workweeks, the agreement treats Class Members equitably, and the proposed distribution

26  plan supports preliminary approval.  *See Cooks v. TNG GP*, 2021 WL 5139613 at *4 (E.D. Cal. Nov. 4,

27  2021) (observing a calculation of payments to class members "on a pro-rata basis based on the number

28  of compensable workweeks each member worked … is fair and treats class members equitably");

                                                    26

1    *Gomez-Gasca v. Future AG Mgmt. Inc.*, 2020 WL 6149688 at *4 (N.D. Cal. Oct. 20, 2020) (approving

2    an agreement including "pro rata allocation based on the number of workweeks the class member

3    performed work during the Class Period"); *see also Martinelli v. Johnson & Johnson*, 2022 WL

4    4123874, at *6 (E.D. Cal. Sept. 8, 2022) ("the pro rata distribution set forth in the Settlement

5    Agreement [is] equitable").

6         **E.**     **Views of Counsel**

7         As addressed above, Class Counsel are experienced in class action litigation.  Ms. Baysinger

8    indicates she believes the Settlement "will result in substantial benefits to all Class Members and is in

9    the collective best interest of the Class."  (Doc. 35-1 at 5, Baysinger Decl. ¶ 25.)  The Settlement also

10   provides: "The Parties and their respective counsel believe and warrant that this Agreement reflects a

11   fair, reasonable, and adequate settlement of the Action…."  (*Id.* at 40, Settlement ¶ 69.)  The opinions

12   of counsel are entitled to significant weight and support approval of the Settlement.  *See Nat'l Rural*

13   *Telecomms.*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are

14   most closely acquainted with the facts of the underlying litigation"); *Barbosa v. Cargill Meat*

15   *Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("the trial court is entitled to, and should, rely

16   upon the judgment of experienced counsel for the parties.").

17         **G.**     **Reaction of Class Members to the Settlement**

18         "[T]he absence of a large number of objections to a proposed class action settlement raises a

19   strong presumption that the terms of a proposed class action settlement are favorable to the class

20   members."  *Nat'l Rural Telecomms.*, 221 F.R.D. at 529; *see also Cottle*, 340 F.R.D. at 376 (observing

21   the court may assess the reaction of class members by considering "how many class members

22   submitted … objections" at the final approval stage).

23         Gonzalez has agreed to the terms of Settlement and executed the agreement.  (*See* Doc. 35-1 at

24   42.)  After receiving the Court-approved Notice, Class Members reacted favorably to the proposed

25   settlement terms by not requesting exclusion or submitting objections.  This "absence of a negative

26   reaction[] strongly supports settlement."  *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852

27   (N.D. Cal. 2010); *see also Taylor v. Populous Group, LLC*, 2023 WL 139724, at *3 (S.D. Cal. Jan 9,

28   2023) (finding the class members' reaction to the settlement—after notice of the settlement terms and

"an opportunity to express their reactions"—supported final approval where no objections to the Settlement were filed); *Manzo v. McDonalds Rests. of Cal., Inc.*, 2022 WL 4586236, at *8 (E.D. Cal. Sept. 29, 2022) ("[t]he lack of any objection weighs in favor of final approval of the settlement"). Accordingly, this factor weighs in favor of final approval.

**III.    Conclusion**

The factors identified under Rule 23 and by the Ninth Circuit weigh in favor of final approval of the Settlement, and the terms of the Settlement are fair, reasonable, and adequate.  Therefore, the request for final approval of the Settlement Agreement is **GRANTED**.

**APPROVAL OF PAGA SETTLEMENT**

California adopted its Private Attorney General Act to allow individual plaintiffs "to bring a civil action to collect civil penalties for Labor Code violations previously only available in enforcement actions initiated by the State's labor law enforcement agencies." *Caliber Bodyworks, Inc. v. Superior Court*, 134 Cal. App. 4th 365, 374 (2005); *see also* Cal. Lab. Code § 2699(a); *Urbino v. Orkin Servs. of Cal., Inc.*, 726 F.3d 1118, 1121 (9th Cir. 2013).  Thus, a PAGA plaintiff now acts "as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009).

Pursuant to PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of himself and other current or former employees.  Cal. Lab. Code § 2699(a). PAGA defines an "aggrieved employee" as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed."  *Id*.  A judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Arias*, 46 Cal. 4th at 986.

To bring an action under PAGA, an aggrieved employee must first provide written notice to the employer and the Labor and Work Force Development Agency.  Cal. Lab. Code § 2699.3(a)(1). Recovery under PAGA is limited to civil penalties, and the civil penalties must be allocated with 75% directed to the LWDA and 25% to aggrieved employees.  *Id.* § 2699(i).  Any proposed settlement of PAGA claims must be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA claims. *Id.* § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp*., 383 F.

Supp. 3d 959, 971 (N.D. Cal. 2019) (because settling a PAGA claim "compromises a claim that could otherwise be brought be the state," it requires that a court "review and approve any settlement of any civil action pursuant to [PAGA]") (citation omitted).

Although there is no binding authority establishing the standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'" *Haralson*, 383 F. Supp. 3d at 972.  This standard is derived principally from the LWDA itself.  *See O'Connor v. Uber Techs., Inc*., 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016).  The LWDA indicated:

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*Id.* (citation omitted).  When a proposed settlement involves overlapping class action and PAGA claims, courts may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair, reasonable, and adequate with reference to the public policies underlying the PAGA." *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *Cooks v. TNG GP*, 2020 WL 5535397 at *9-10 (E.D. Cal. Sept. 15, 2020) (same). "[W]here the settlement for the rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled." *Cooks*, 2020 WL 5535397 at *10 (quoting *O'Connor*, 201 F. Supp. 3d at 1134).

Class Counsel report the proposed Settlement Agreement was submitted to the LWDA as required by the Labor Code on September 12, 2022.  (Doc. 35-1 at 15, Baysinger Decl. 68; *see also id.* at 60, Exh. 6 [e-mail confirmation of the submission to the LWDA].)  The settlement of $290,000.00 appears sufficiently large—with more than $150,000 going to Class Members—such that the Court finds the purposes of PAGA to address the alleged labor violations are fulfilled by the proposed agreement.  Under the Settlement Agreement, $10,000 of the Gross Settlement Amount is designated as the PAGA payment.  (Doc. 35-1 at 23, Settlement ¶ 25.)  The Settlement properly designates 75% of the PAGA funds to the LWDA—in the amount of $7,500 from the Gross Settlement Amount—and

the remaining $2,500 to the aggrieved employees.  (*Id.*; *see also id.* at 27, ¶ 45(c).)  Accordingly, the Court finds approval of the PAGA payment is also appropriate.  *See Jamil v. Workforce Resources*, 2020 WL 6544660 at *6 (S.D. Cal. Nov. 5, 2020) (finding a $10,000 PAGA award to be fair and adequate as part of a class settlement).

**REQUEST FOR ATTORNEYS' FEES**

Pursuant to the Settlement, Class Counsel may seek attorney's fees in the amount of 33 1/3 % of the Gross Settlement Amount, or $96,667.67.  (Doc. 35-1 at 27, Settlement ¶ 45(b).)  Class Counsel assert this amount "is fair, reasonable, and appropriate in light of the favorable results obtained by Plaintiff's Counsel, the complexities of the litigation, the contingent risk, and the lodestar incurred." (Doc. 84 at 8.)  AT&T does not oppose the fee request.  (*See* Doc. 75-2 at 8, ¶ 23).

**I.      Legal Standards**

"[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003).  Thus, a court "may not uncritically accept a fee request," but must review the time billed and assess whether it is reasonable in light of the work performed and the context of the case.  *Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (a court may not adopt representations regarding the reasonableness of time expended without independent review); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984) (remanding an action for a thorough inquiry on the fee request when "the district court engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing party wholesale" and explaining a court should not "accept[] uncritically [the] representations concerning the time expended").

Class Counsel assert the reasonableness of the fee request should be evaluated under California law, because the Court has diversity jurisdiction over this action.  (Doc. 36-1 at 9, citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Circ. 2002) (holding state law governing underlying claims in a diversity action "also governs the award of fees")).  However, Class Counsel contend the percentage requested is also reasonable under Ninth Circuit precedent.  (*See id* at 12.)  Notably, as discussed below, both state and federal courts consider similar tests to evaluate the reasonableness of the fees requested from a settlement fund.

1    The Court has discretion to use either a lodestar or percentage calculation to evaluate a fee

2  request.  *See Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *see also*

3  *Laffitte v. Robert Half Int'l Inc.,* 1 Cal.5th 480, 504 (2016) ("The choice of a fee calculation method is

4  generally one within the discretion of the trial court, the goal under either the percentage or lodestar

5  approach being the award of a reasonable fee to compensate counsel for their efforts.").  Whether the

6  Court applies the lodestar or percentage method, the fees awarded must comply with Rule 23 and be

7  "fundamentally fair, adequate, and reasonable."  *Staton*, 327 F.3d at 963 (quoting Fed.R.Civ.P. 23(e)).

8    **A.     Lodestar method**

9    The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably

10  expended by counsel on the particular matter times a reasonable hourly rate."  *Florida*, 915 F.2d at 545

11  n. 3 (citing *Hensley*, 461 U.S. at 433); *see also Laffitte*, 1 Cal. 5th at 489.  The product of this

12  computation, the "lodestar" amount, yields a presumptively reasonable fee.  *Gonzalez v. City of*

13  *Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 978

14  (9th Cir. 2008).  Next, the Court may adjust the lodestar upward or downward using a "multiplier"

15  considering factors adopted by the Ninth Circuit:

16              (1) the time and labor required, (2) the novelty and difficulty of the
               questions involved, (3) the skill requisite to perform the legal service
17              properly, (4) the preclusion of other employment by the attorney due to
               acceptance of the case, (5) the customary fee, (6) whether the fee is fixed
18              or contingent, (7) time limitations imposed by the client or the
               circumstances, (8) the amount involved and the results obtained, (9) the
19              experience, reputation, and ability of the attorneys, (10) the
               "undesirability" of the case, (11) the nature and length of the professional
20              relationship with the client, and (12) awards in similar cases.[5]

21  *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).  Likewise, under California law,

22  "[o]nce the court has fixed the lodestar, it may increase or decrease that amount by applying a positive

23  or negative multiplier to take into account a variety of other factors, including the quality of the

24  representation, the novelty and complexity of the issues, the results obtained, and the contingent risk

25  presented."  *Laffitte*, 1 Cal.5th at 489 (internal quotation marks omitted).

26  *///*

27

28  _____
[5] The Ninth Circuit has since determined the nature of a fee and the "desirability" of a case are no longer relevant factors. *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citation omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.       Percentage from the common fund**

As the name suggests, under this method, "the court makes a fee award on the basis of some percentage of the common fund." *Florida*, 915 F.2d at 545 n. 3.  "The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark." *Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 491 (E.D. Cal. 2010); *see also Powers*, 299 F.3d at 1256 (noting the Ninth Circuit "established twenty-five percent of the recovery as a 'benchmark' for attorneys' fees calculations under the percentage-of-recovery approach").  California has recognized that fee awards "average around one-third of the recovery," but also endorsed the federal benchmark.  *See Chavez v. Netflix, Inc.,* 162 Cal.App.4th 43, 66 n.11 (2008); *see also In re Consumer Privacy Cases*, 175 Cal.App.4th 545, 557 n. 13 (2009) ("25 percent is the benchmark award that should be given in common fund cases").

To evaluate whether the requested percentage is reasonable, courts may consider a number of factors, including: (1) the results obtained for the class; (2) the risk undertaken by class counsel, including the complexity of the issues; (3) the length of the professional relationship between class counsel and the plaintiffs; and (5) the market rate, with a lodestar cross-check.  *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1048-1050 (9th Cir. 2002); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *see also Laffitte*, 1 Cal. 5th at 504 (determining the reasonableness of percentage fee through considering "the risks and potential value of the litigation;" the "contingency, novelty and difficulty" of the case; and "the skill shown by counsel, the number of hours worked, and the asserted hourly rates"). The percentage of the common fund awarded as fees may be adjusted below or above the benchmark, but the Court's reasons for adjustment must be clear.  *Graulty*, 886 F.2d at 272; *see also In re Bluetooth Headset Prod. Liab. Litig.,* 654 F.3d 935, 942 (9th Cir. 2011) ("courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure").

**C.       Fee applicant's burden**

Notably, the Court must consider similar factors under both the lodestar method and awarding a percentage of the common fund.  *See Kerr*, 526 F.2d at 70; *Vizcaino*, 290 F.3d at 1048-1050.  With either method, the fee applicant bears the burden of establishing that the fees and costs were reasonably

necessary to achieve the results obtained.  *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th 2000).  Therefore, a fee applicant must provide records documenting the tasks completed and the amount of time spent.  *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007).  "Where the documentation of hours in inadequate, the district court may reduce hours accordingly."  *Hensley*, 461 U.S. at 433.

## II.      Evaluation of the Fees Requested

As noted above, Class Counsel contend "[t]he attorneys' fee award should be approved under the common fund methodology."  (Doc. 36-1 at 6.)  Under the "common fund" doctrine, attorneys who create a common fund for a class may be awarded fees from that fund.  *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf."  *Boeing Co.*, 444 U.S. at 478.  Because the Settlement applies a *pro rata* distribution formula to determine the amount paid to each class member, the Court agrees application of the common fund doctrine is appropriate.

Significantly, when fees are to be paid from a common fund, as here, the relationship between the class members and counsel "turns adversarial."  *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  The Ninth Circuit observed:

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class.  It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

*Id.* at 1302 (internal quotation marks, citation omitted).  As a result, the district court must assume a fiduciary role for the class members in evaluating the reasonableness of a request for fees from the common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

**A.     Time and labor required**

Class Counsel report they worked 252.90 hours on work related to this action, including 132.5 hours by Jenny Baysinger and 120.4 hours by Robert Wasserman.  (Doc. 36-1 at 18; *see also* Doc. 36-2 at 19, Baysinger Decl. ¶ 80.)  Class Counsel contend they "sought to efficiently manage, staff, assign, and divide the work between the respective attorneys in Class Counsel's office and to avoid duplication of effort."  (Doc. 36-1 at 18, citing Baysinger Decl. ¶¶ 77-79.)  Class Counsel note they also anticipate additional time responding to inquiries from Class Members, "overseeing administration of the Settlement, and reporting to the Court." (*Id.* at 18-19.)  According to Class Counsel, "[w]ork performed on this matter necessarily required Mayall Hurley P.C. to forego other profitable work."  (Doc. 36-2 at 17, Baysinger Decl. ¶ 77.)  Based upon the time expended and information provided by Ms. Baysinger, the Court finds this factor supports an award of the fees requested by Class Counsel.

**B.     Results obtained for the Class**

The result achieved for the class is a major factor to be considered in making a fee award. *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994); *see also Lealao v. Beneficial California, Inc.*, 82 Cal.App.4th 19, 45 (2000) (observing "California courts often use ... the result obtained by counsel" as a relevant factor in evaluating fees, including enhancing a lodestar).  The Ninth Circuit observed that "[e]xceptional results are a relevant circumstance" to an adjustment from the benchmark award.  *Vizcaino*, 290 F.3d at 1048.

Class Counsel assert that "[t]he fee request is justified by the positive results achieved."  (Doc. 36-1 at 13, emphasis omitted.)  Class Counsel observe: "Participating Class Members … will receive a share of the Net Settlement Amount of $159,936.30; an expected average distribution of over $700." (*Id.*, citing Reyes Decl. ¶ 12 [Doc. 35-2 at 4], Baysinger Decl. ¶¶ 44, 60, 69 [Doc. 36-2 at 9, 13, 15-16].)  According to Class Counsel, "[t]his recovery represents substantial monetary relief for the Class given the complexity of the issues, the risk and uncertainty inherent in class action litigation, and the myriad factual and legal defenses advanced by Defendants."  (*Id.*, citing Baysinger Decl. ¶¶ 27-43, 44-45.)  However, Class Counsel do not argue such results are *exceptional*, such that an upward departure from the benchmark is warranted.  Indeed, this Court previously indicated the recovery of approximately 30% of a defendant's liability exposure is not "exceptional."  *See, e.g., Monterrubio*,

34

291 F.R.D. at 466 (finding "the circumstances of the litigation simply do not lead the Court to conclude that the result is 'exceptional'" where the recovery for the class equaled "30% of Plaintiff's calculation of Defendant's maximum liability exposure").  Accordingly, this factor does not support the requested upward departure from the benchmark.

### C.      Risks undertaken by counsel

The risk of costly litigation and trial is an important factor in determining the fee award. *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits."  *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

Class Counsel contend they "undertook considerable risk in litigating this case, not just because it was done on a wholly contingency basis, but also because complex, representative wage-and-hour litigation is an ever-emerging area under the law."  (Doc. 36-1 at 14.)  Class Counsel assert that "judicial decisions could potentially detrimentally impact some claims asserted on behalf of the Class if the matter proceeded through litigation."  (*Id.*)  According to Class Counsel, "This is a common occurrence in the ever-changing landscape of California wage and hour litigation and compounds the risks inherent in representation on a contingency basis."  (*Id.*)  Class Counsel report that Xtreme intended to raise the following arguments:

> 1) off-the-clock claims should not be certified, 2) Xtreme has an express written policy requiring employees to accurately record time worked and providing that each will be compensated for all time worked, 3) Xtreme's express written meal/rest break policies are compliant and Class Members regularly averred in writing that they were given the opportunity for all required meal/rest breaks, 4) any underpayments were inadvertent, based on a good faith mistake of law, and thus insufficient to justify imposition of waiting time penalties and/or that the waiting time penalty was so disproportionate to the actual unpaid/underpaid wages as to offend the Constitution, 5) that it acted in good faith and thus waiting time penalties are not authorized, and 6) that its wage statements did not result in actual injury and/or that they are distinguishable from the wage statements found violative in *McKenzie v. Fed. Express Corp.*, 765 F.Supp.2d 1222 (C.D. Cal. 2011) and thus do not engender any liability for statutory penalties under 226(e) or civil penalties pursuant to the PAGA.

(*Id.*, citing Baysinger Decl. ¶¶ 45-55.)  Class Counsel believe "[s]uccess on any one of these challenges would, in a best case scenario for Class Members, substantially limit Defendants'

exposure." (*Id.*; *see also* Doc. 36-2 at 9, Baysinger Decl. ¶ 45.)  Ms. Baysinger explains that "at the very least," the anticipated issues would cause "substantial motion practice." (Doc. 35-2 at 9, ¶ 45.)

For example, Class Counsel report Xtreme "was expected to try to defeat the UCL claim entirely and thus eliminate and entire year of potential damages." (*Id.* at 14, citing *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 845 (9th Cir. 2020).)  Class Counsel observe that in *Sonner*, the Ninth Circuit dismissed "claims for restitution that overlap[ped] with claims for damages in every way except statute of limitations," and at least one district court applied *Sonner* to an "employee's claim to recover wages." (*Id.* at 15, citing *Franckowiak v. Scenario Cockram USA, Inc.*, 2020 WL 9071697 * 3 (C.D. Cal. Nov. 30, 2020).)

In addition, Ms. Baysinger believes there were risks to the meal and rest break claims, because Xtreme maintained "all meal and rest periods were lawfully provided as evidenced by the written waivers/ acknowledgments Xtreme routinely obtains, and the failure to properly pay meal rest period premiums was not sufficiently willful to allow for imposition of waiting time penalties." (Doc. 36-2 at 9, ¶ 45.)  In addition, Ms. Baysinger reports the break waivers and acknowledgements posed a risk to class certification—or maintaining class status if a class was certified— because individualized inquiries may be required regarding the reason breaks were not taken by class members.  (*Id.* at 11, ¶ 51, citing *Hines v. KFC U.S. Properties, Inc.*, 2010 WL 11451496 * 4-5 (S.D. Cal. Oct. 22, 2010) and *Ruiz v. Affinity Logistics Corp.*, 2009 WL 648973 * 6 (S.D. Cal. Jan. 29, 2009).)  Ms. Baysinger also notes "it was only recently established law that meal and rest period premiums constitute 'wages' which are required to be paid in full on separation," which was another reason counsel anticipated Xtreme could "argue[] any failures to pay all wages could not have been sufficiently 'willful' to justify imposition of waiting time penalties." (*Id.* at 10, ¶ 46, citing *Diaz v. Grill Concepts Svcs., Inc.*, 23 Cal.App.5th 859, 868 (2d Dist. Cal. 2018).)

Notably, the Ninth Circuit suggested the distinction between a contingency arrangement and a fixed fee arrangement alone does not merit an enhancement from the benchmark.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7 (9th Cir. 2011) ("whether the fee was fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees) (citation omitted); *but see In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 954-55 (9th Cir. 2015) (finding the

contingent nature of litigation remains a relevant factor to evaluate a request from the common fund). Nevertheless, the risk of a contingency fee case may also be considered under California law. *Laffitte*, 1 Cal. 5th at 487; *see also Arredondo v. Southwestern & Pac. Specialty Fin., Inc.*, 2022 WL 2052681, at *12 (E.D. Cal. June 7, 2022) (observing *Laffitte* discussed contingency as a factor in evaluating a fee request, and considering counsel's risk with a contingency action where the Court had diversity jurisdiction). Further, Class Counsel identified legal risks to the claims made by Gonzalez—including difficulty proceeding with meal and rest break claims on a class-wide basis— and the potential for the liability period to be shortened following the decisions of *Sonner* and *Frankowiak*. Therefore, this factor supports granting the fees requested.

### D.      Complexity of issues and skill required

The complexity of issues and skills required may support a departure from the benchmark fee award. *See In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 379 (9th Cir. 1995) (finding no abuse of discretion in awarding attorney's fees that totaled 33% settlement fund, finding a departure from the benchmark was warranted "because of the complexity of the issues and the risks"); *see also Ross v. Bar None Enters.*, 2015 WL 1046117, at *9 (E.D. Cal. Mar. 10, 2015) ("Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award" [citation omitted]).

Class Counsel assert they have "demonstrated substantial skill, diligence, and high quality of work in achieving the proposed Settlement." (Doc. 36-1 at 15.) They contend that "[t]he Settlement, and the cognizable monetary benefit it conveys to the Class, was obtained efficiently and effectively without wasted effort or years of needless, costly litigation." (*Id.*) According to Class Counsel, as a result their "significant experience representing plaintiffs in wage and hour class, collective, and representative actions"—as well as their effort and skill—"Gonzalez was well-positioned to reach a favorable settlement for the Class." (*Id.*) Class Counsel report the reaching the Settlement "required significant expertise, engaging in written discovery, employment of a damages expert, a full-day mediation and protracted, at times contentious, negotiations to achieve." (*Id.*)

Class Counsel do not identify any particular complex issues faced in the mater. On the other hand, the experience and skill of Class Counsel undoubtedly benefited Gonzalez and Class Members,

as the parties reached an agreement approximately fourteen months after the Court held a Scheduling

Conference and thus opened discovery.  (*See* Docs. 14, 27.)  In May 2021, "Plaintiff propounded

formal discovery that was then set aside in favor of informal pre-mediation data and information

exchange."  (Doc. 35-1 at 3, Baysinger Decl. ¶ 12.)  Xtreme produced "hundreds of pages of documents

relating to its policies, practices and procedures, as well as more than 400,000 line items of payroll and

time data (each line consisting of multiple data points) relating to 205 putative Class Members."  (*Id.* at

4, ¶ 14.)  Class Counsel report they retained an "expert to analyze the data," and "had multiple

discussions with Plaintiff's retained expert to ensure the parameters of the analysis were appropriate

and accurate, the data provided was usable and reliable (including cross-checking with Plaintiff's time

records to ensure accuracy), and the reliability of the damages model."  (*Id.*)  Based upon the

information provided, Class Counsel displayed skills consistent of those that would be expected of

attorneys of comparable experience.  Thus, this factor supports the requested fee award.

### E.       Length of the professional relationship

Class Counsel initiated this action on behalf of Gonzalez in 2020, and it appears the

professional relationship has lasted approximately three years.  The short duration of the professional

relationship may warrant an award below the benchmark.  *See Six Mexican Workers v. Ariz. Citrus

Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (finding "the 25 percent standard award" was

appropriate although "the litigation lasted more than 13 years").

### F.       Lodestar crosscheck and market rate

As noted above, the Court may perform a lodestar cross-check to assist in the determination of

whether the fees sought from a common fund are reasonable.  *See Indirect Purchaser Class v. Erwin (In

re Optical Disk Drive Prods. Antitrust Litig.*), 959 F.3d 922, 933 (9th Cir. 2020) ("we have encouraged

courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar

method to confirm that the percentage-of-recovery amount is reasonable"); *Laffitte*, 1 Cal. 5th at 504

("A lodestar cross-check … provides a mechanism for bringing an objective measure of the work

performed into the calculation of a reasonable attorney fee.").  The lodestar is calculated by multiplying

the time "reasonably expended" by counsel on the by "a reasonable hourly rate."  *Florida*, 915 F.2d at

545 n. 3 (citing *Hensley*, 461 U.S. at 433); *see also Laffitte*, 1 Cal. 5th at 489.

1          1.          Time expended

2          In general, the first step in determining the lodestar is to determine whether the number of

3    hours expended was reasonable.  *Fischer*, 214 F.3d at 1119; *Laffitte*, 1 Cal. 5th at 489.  When the

4    lodestar is used as a cross-check for a fee award, the Court is not required to perform an "exhaustive

5    cataloguing and review of counsel's hours."  *See Barbosa v. Cargill Meat Sols. Corp.,* 297 F.R.D. 431,

6    451 (E.D. Cal. 2013) (citation omitted).  However, the Court has the discretion to review submitted

7    time sheets to determine whether the time expended was reasonable.  *See In re Washington Public*

8    *Power Supply System Securities Litigation,* 19 F.3d 1291, 1298 (9th Cir.1994) (concluding the district

9    court acted within its discretion in reducing the lodestar for unnecessary and duplicative work); *see*

10   *also Laffitte*, 1 Cal. 5th at 505 ("trial courts retain the discretion to consider detailed time sheets as part

11   of a lodestar calculation, even when performed as a cross-check on a percentage calculation").

12         The Court has reviewed the billing records provided by Class Counsel.  The reported 252.9

13   hours included: preparation of the pleadings; communications with Gonzalez, opposing counsel, and

14   expert regarding class data; discovery; mediation; and preparation of the motions for approval of the

15   Settlement.  The Court's review of the time sheets confirms Class Counsel did not overbill or perform

16   unnecessary tasks.  Consequently, the Court finds the time expended was reasonable.

17         2.          Hourly rates

18         Next, the Court must determine whether the hourly rates are reasonable to calculate the

19   lodestar.  *See Florida*, 915 F.2d at 545 n.3; *see also Laffitte*, 1 Cal. 5th at 489.  The Supreme Court

20   explained attorney fees are to be calculated with "the prevailing market rates in the relevant

21   community."  *Blum v. Stenson*, 465 U.S. 886, 895-96 and n.11 (1984).  In general, the "relevant

22   community" for purposes of determining the prevailing market rate is the "forum in which the district

23   court sits."  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).  Thus, when a case is

24   filed in the Eastern District of California, this District "is the appropriate forum to establish the

25   lodestar hourly rate…"  *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).

26         Fee applicants bears a burden to establish that the requested rates are commensurate "with

27   those prevailing in the community for similar services by lawyers of reasonably comparable skill,

28   experience, and reputation."  *Blum*, 465 U.S. at 895 n.11.  The applicants meet this burden by

39

producing "satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.*; *see also Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community … are satisfactory evidence of the prevailing market rate.").  The Court may apply "rates from outside the forum ... 'if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case.'"  *Barjon v. Dalton*, 132 F.3d 496 (9th Cir. 1997) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992)).

Class Counsel report their "customary hourly rate in plaintiff's employment class action cases ranges from $508/hr (for an associate with 7 years' experience litigating plaintiffs' employment cases) to $997/hr (for a senior partner with nearly 30 years of experience)."  (Doc. 36-1 at 19.)  To calculate their lodestar, Class Counsel applied an hourly rate of $764 for Ms. Baysinger and Mr. Wasserman, who were admitted to the bar in 2007 and 2008 respectively.  (Doc. 36-2 at 18-19, Baysinger Decl. ¶¶ 79-80.)  Class Counsel report "[t]hese rates are based upon the 2022-2023 Adjusted Laffey Matrix for the District of Colombia," which counsel note is "a matrix that has been used by California district courts in determining reasonable hourly rates."  (Doc. 36-1 at 19, n.4, citing *Chanel, Inc. v. Doan*, 2007 WL 781976 *6-7 (N.D. Cal. 2007); *Garnes v. Barnhardt*, 2006 WL 249522 *7 (N.D. Cal. 2006); *Viveros v. Donahoe*, 2013 WL 1224848, *5-6 (C.D. Cal. 2013).)  Class counsel contend "[s]imilar and higher rates are commonly approved in the Northern California/Sacramento region."  (*Id.*, citing *In re Magsafe Apple Power Adapter Litig.*, 2015 WL 428105 * 12 (N.D. Cal. 2015).)

Significantly, Class Counsel cite cases in the Northern District and Central District to support the assertion that the Court should adopt the rates based upon the Laffey Matrix.  However, the matter now pending is in the Eastern District, and as a result the identified decisions adopting the Laffey Matrix— and awarded hourly rates in the Northern and Central Districts—do not assist this Court. The Eastern District "has repeatedly declined to adopt the Laffey matrix, as it only surveys prevailing rates in the Washington, D.C. legal community and does not directly correlate to hourly rates for attorneys and paralegals in other parts of the country."  *Cabardo v. Patacsil*, 2022 WL 956951, at *3

40

1    (E.D. Cal. Mar. 29, 2022) (citations omitted); *see also Hassine v. Johnson*, 53 F. Supp. 3d 1297, 1307

2    (E.D. Cal. 2014) (rejecting application of the Laffey Matrix adjusted "to reflect the 'Los Angeles

3    market rate'" because it was not the relevant legal community for an action filed in the Eastern

4    District, and there was "no evidence as to the prevailing market rate for similar legal services in

5    Fresno, California"); *Chapman v. Jacobs*, 2019 WL 4259765, at *4 (E.D. Cal. Sept. 9, 2019)

6    (declining to use the Laffey Matrix to determine a reasonable hourly rate because "it is not an accurate

7    tool to assess market rates in this district") *aff'd*, 836 Fed. App'x 606 (9th Cir. 2021).

8           This Court has performed a comprehensive survey of fees awarded in the Eastern District, and

9    finds current hourly rates range from $200 to $750, with hourly rates exceeding $600 reserved for

10   attorneys who have been practicing approximately 30 years.  *See, e.g., Mostajo v. Nationwide Mut. Ins.*

11   *Co.*, 2023 WL 2918657, at *11 (E.D. Cal. Apr. 12, 2023) (approving of "hourly rates ranging from

12   $650 through $750" for "attorneys with over thirty years of experience" for purposes of calculating a

13   lodestar); *Manzo v. McDonalds Rests. of Cal., Inc.*, 2022 WL 4586236, at *10 (E.D. Cal. Sept. 29, 2022)

14   (rejecting the requested hourly rate of $750 for attorneys who were "experienced wage and hour and

15   class action litigators, with 18 or more years of experience each") and reducing the rate for purpose of

16   calculating the lodestar); *Cooks v. TNG GP*, 2021 WL 5139613, at *6 (E.D. Cal. Nov. 4, 2021)

17   (calculating the lodestar using the rate of $695 for attorneys with 30 years' experience and $660 for

18   attorneys with 20 to 30 years' experience); *see also Cianchetta v. BMW of N. Am., LLC*, 2022 WL

19   2160556, at *6 (E.D. Cal. June 13, 2022) (reducing the hourly rate for attorneys in their first year of

20   practice to $200).  Thus, the hourly rate of $764 requested by Class Counsel clearly exceeds the rates

21   awarded to the most experienced wage and hour litigators in the Eastern District and must be adjusted

22   to calculate the lodestar.

23          Based upon the experience of counsel—who have practiced for approximately 15 years each—

24   the Court finds the hourly rate of $450 is appropriate for purposes of performing the lodestar

25   crosscheck.  *See Cianchetta v. BMW of N. Am., LLC*, 2022 WL 2160556, at *5 (finding an hourly rate

26   of $505 was reasonable for an attorney with "roughly 20 years of experience"); *see also Aoki v. Gilbert*,

27   2022 WL 956949, at *2 (E.D. Cal. May 29, 2022) (observing the Court found "450 an hour [was] a

28   reasonable rate for an attorney with fifteen years of experience" [citation omitted]); *Price Simms*

*Holdings v. Candle3*, 2021 WL 1884995, at *2 (E.D. Cal. May 11, 2021) (finding $400 was appropriate "for partners with between 10 and 20 years of experience"). This downward adjustment aligns the hourly rate used to calculate the lodestar for Class Counsel with the prevailing market rates and rates awarded within the Eastern District. *See Mostajo*, 2023 WL 2918657, at *11; *Price Simms Holdings*, 2021 WL 1884995, at *2.

### 3. Calculation and cross-check

With the adjusted hourly rate for counsel, the lodestar for Class Counsel totals $113,805.00:

| COUNSEL | HOURS | RATE | LODESTAR |
|---|---|---|---|
| Jenny D. Baysinger | 132.5 | $450 | $59,625.00 |
| Robert Wasserman | 120.4 | $450 | $54,180.00 |
| | | | $113,805.00 |

Even with the downward adjustment to the hourly rate, the lodestar exceeds the amount of fees now requested by Class Counsel. Consequently, the lodestar cross-check supports a conclusion that the fees requested are reasonable. *See Gonzalez*, 729 F.3d at 1202; *Laffitte*, 1 Cal. 5th at 489.

## III. Conclusion

The factors set forth above weigh in favor of granting the fees requested, totaling one-third of the gross settlement fund. Moreover, the lodestar—which is a presumptively reasonable amount— supports the requested upward departure from the benchmark. The fees requested are fair, adequate, and reasonable as required under Rule 23. Therefore, Class Counsels' request for fees is **GRANTED** in the amount of **$96,666.67**.

## REQUESTS FOR COSTS

## I. Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (citation omitted). Generally, reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54. Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994). In addition, costs may be awarded under

1   California law to an employee who prevails on a PAGA claim.  *See* Cal. Lab. Code § 2699(g).

2          Class Counsel now request $12,897.03 in costs.  (Doc. 36-1 at 20.)  The itemized costs for Class

3   Counsel include fees for filing and mediation, as well as the expert fees.  (Doc. 36-2 at 74.)  Previously,

4   this Court observed that costs "including filing fees, mediator fees …, copy charges, computer research,

5   and database expert fees … are routinely reimbursed" in class action cases.  *Alvarado v. Nederend*,

6   2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17, 2011); *see also Ontiveros*, 303 F.R.D. at 375

7   (finding costs including to mediation, court fees, research, and expert fees were "reasonable litigation

8   fees" and approving class counsel's request for costs).  Because the costs requested are reasonable and

9   the type routinely approved, the request for litigation costs is **GRANTED** in the amount of **$12,897.03**.

10  **II.     Costs of Settlement Administration**

11         The parties agreed the Settlement Administrator shall receive a payment from the gross

12  settlement fund for its duties, including:

13             formatting, printing, and mailing the Notice Packet to all Class Members;
               conducting a National Change of Address search to update Class Member
14             addresses before mailing the Notice Packets; re-mailing Notice Packets
               that are returned to the Class Member's new address as located upon skip-
15             tracing or as provided by Counsel for the Parties; setting up a toll-free
               telephone number to receive calls from Class Members, and a post office
16             box to receive communications from Class Members which include for
               instance, disputed claims, change of address forms, requests for exclusion,
17             and objections, providing the Parties with weekly status reports,
               calculating Individual Class Settlement Payments and Individual PAGA
18             Payments; issuing the checks to effectuate the payments due under the
               Settlement; issuing the tax reports and filings required under this
19             Settlement and to administrate the Settlement, including, but not limited
               to, the DE 9, the DE 9C, 1099s, W-2s and W-3s; handling uncashed
20             checks, and providing declarations as requested by the Parties, and
               otherwise administering the Settlement pursuant to this Agreement.

21

22  (Doc. 35-1 at 27, ¶ 45(d).)  Ms. Reyes reports that "Simpluris' total costs for services in connection

23  with the administration of this Settlement, including fees incurred and anticipated future costs for

24  completion of the administration, are $5,500.00."  (Doc. 35-2 at 5, Decl. ¶ 19.)  Gonzalez now seeks

25  approval of a payment of $5,500.00 for the Settlement Administrator.  (Doc. 35-3 at 25.)

26         Based upon the information provided regarding the tasks performed by the Settlement

27  Administrator— and the continuing responsibilities with the calculation of the settlement shares,

28  issuance and mailing of those settlement payments, and any necessary tax reporting on such

43

payments—the Court finds the requested Settlement Administration costs are reasonable.  Therefore, the request for **$5,500.00** for the Settlement Administrator is **GRANTED**.

**CLASS REPRESENTATIVE PAYMENT**

A class representative may "receive a share of class recovery above and beyond [his] individual claim" with a service payment, also known as an "incentive payment." *China Agritech, Inc. v. Resh*, 138 S.Ct. 1800, 1811 n.7 (2018); *see also Staton*, 327 F.3d at 977 ("named plaintiffs … are eligible for reasonable incentive payments").  However, incentive payments for class representatives are *not* to be given routinely.  The Ninth Circuit observed: "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Staton*, 327 F.3d at 975 (citations omitted).

**I.       Awarding an Service Payment**

The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all incentive awards." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1165 (9th Cir. 2013).  In evaluating a request for a service payment to a class representative, the Court must consider: "'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation,' and any financial or reputational risks the plaintiff faced." *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022) (quoting *Roes, 1-2 v. SFBSC Mgmt., LLC,* 944 F.3d 1035, 1057 (9th Cir. 2019)); *see also Staton* 327 F.3d at 977.  Further, payments may recognize a plaintiff's "willingness to act as a private attorney general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

The Settlement provides that Gonzalez may apply for a service "award of not more than $5,000" from the Gross Settlement Amount.  (Doc. 36-2 at 30, Settlement ¶ 45(a).)  The Settlement explains the service payment is "to compensate [Gonzalez] for initiating the Action, performing work in support of the Action, undertaking the risk of liability for Defendant's expenses in the event he failed in the prosecution of the Action, and for the general release of all claims by him…." (*Id.* at 26, ¶11.)  Gonzalez now requests the Court approve a service payment of $5,000.  (Doc. 36-1 at 22.)

44

### A.    Time expended

The Eastern District has awarded service payments for "substantial efforts taken as a class representative when the plaintiff has undertaken at least 30 to 40 hours of work." *Greer v. Dick's Sporting Goods, Inc.*, 2020 WL 5535399, at *4 (E.D. Cal. Sept. 15, 2020) (internal quotation marks, citation omitted); *see also Emmons v. Quest Diagnostics Clinical Laboratories, Inc.,* 2017 WL 749018, at *8 (E.D. Cal. Feb. 27, 2017) (awarding payments when each plaintiff reported "approximately 30-40 hours assisting their attorneys in the prosecution of this lawsuit" [modification adopted]).  Gonzalez estimates that he "spent approximately 40 hours… to help vindicate the rights of the Class."  (Doc. 36-3 at 3, ¶ 11.)  This amount of time weighs in favor of issuing a service payment.

### B.    Actions taken to benefit the class

Gonzalez asserts that in November 2020, he "interviewed attorneys and ultimately selected Mayall Hurley, P.C. to represent me and the other employees of Xtreme who were subject to the same pay and meal/rest break problems…" (Doc. 36-6 at 2, Decl. ¶ 7.)  Gonzalez reports that litigation tasks in which he was "actively involved" included: providing documents and information to Class Counsel, "[r]eviewing documents and policies produced by Xtreme with Class Counsel to assist them in understanding how Xtreme operates," preparing for and attending mediation, participation in the settlement negotiations, and regular communications with Class Counsel regarding the case status. (*Id.* 2-3, ¶ 10.)  Notably, Gonzalez likely would have taken many of these actions even if proceeding with individual claims.  On the other hand, by reviewing documents and assisting with discovery, his actions undoubtedly benefitted Class Members, who will receive an average payment of $733.65.

Gonzalez also notes that he has "given up all potential claims he may have had against Xtreme." (Doc. 36-1 at 22, emphasis omitted; *see also* Doc. 36-3 at 3, ¶ 15.)  Ms. Baysinger notes this includes claims plead by Gonzalez for failure to provide timely records, which she estimates were "collectively worth $1,500."  (Doc. 36-2 at 16, Baysinger Decl. ¶ 71.)  Accordingly, the actions taken on behalf of the class support a service payment to Gonzalez.

### C.    Workplace retaliation

The Court may consider whether the named plaintiff has "reasonable fears of workplace retaliation" in evaluating a request for a service payment.  *Staton*, 327 F.3d at 977.  However, this

Court observed previously that when a class representative was a former employee—as here—retaliation by the defendant was not possible.  *See Torcia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 280 (E.D. Cal. 2014).  Because Gonzalez cannot suffer workplace retaliation from Xtreme, this factor does not support a service payment.

### D.    Reputational risk

Gonzalez notes the Southern District of New York has indicated "plaintiffs in the employment context 'face[] the risk that new employers would learn that they were class representatives in a lawsuit against their former employer and take adverse action against them.  Moreover, each time they change jobs, they will risk retaliation in the hiring process.'"  (Doc. 36-1 at 21, quoting *Asare v. Change Grp. N.Y., Inc.*, 2013 WL 6144764, at *15 (S.D.N.Y. Nov. 15, 2013).)  Gonzalez declares, "As a named plaintiff and class representative, I have exposed myself to the negative reputational consequences of my name being tied to a class action lawsuit."  (Doc. 36-3 at 3, Decl. ¶ 12.)

Previously, this Court found an identified reputational risk was "real and substantial" where the plaintiff reported that "[f]uture potential employers need only search for [the plaintiff's name] and her former employer's name to learn that she has pursued wage and hour claims against her former employer."  *Flores v. Dart Container Corp.*, 2021 WL 1985440, at *10 (E.D. Cal. May 17, 2021).  The Court found this risk supported making a service payment to the class representative.  *Id.*  Likewise, Gonzalez reports: "a Google search of my name and that of 'Xtreme' reveals—as the very first result—that I filed [an] employment-related lawsuit against them."  (Doc. 36-3 at 3, ¶ 13 [emphasis omitted].)  Gonzalez contends his status as a class representative "could obviously be frowned upon [and] will be readily available to any prospective employer forever."  (*Id.*)  This reputational risk supports a service payment.  *See Flores*, 2021 WL 1985440, at *10.

### E.    Financial risks

Gonzalez observes that he bore a financial risk, because he had "the significant financial risk of Defendants' costs in the event he lost at trial."  (Doc. 36-1 at 21, citing Gonzalez Decl. ¶¶ 12-13 [Doc. 36-3 at 3].)  Gonzalez contends this risk, "in a complex employment class action involving more than 200 current and former employees, could easily total tens of thousands of dollars."  (Doc. 36-1 at 22.)  Courts in the Ninth Circuit have repeatedly acknowledged such a financial risk supports an incentive

46

payment to a class representative.  *See, e.g., Vasquez,*  266 F.R.D. at 491 ("Class Representatives undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for any costs awarded in favor of Defendant"); *Wilson v. Metals USA, Inc.*, 2021 WL 516585, at *9 (E.D. Cal. Feb. 11, 2021) (noting the plaintiffs asserted that "by initiating this case, they assumed the risk of a judgment against them and personal liability for an award of costs to defendant in the event of an adverse outcome, and finding the identified financial risk "weighs in favor of granting an incentive award"); *Jones v. Abercrombie & Fitch Trading Co*., 2018 U.S. Dist. LEXIS 198001, at *26 (C.D. Cal. Nov. 19, 2018) (considering the named plaintiffs "assumed financial risk for paying costs if the case had been lost" in awarding service payments; *Pierce v. Rosetta Stone, Ltd.*, 2013 WL 5402120, at *7 (N.D. Cal. Sept. 26, 2013) ("the Class Representatives undertook a financial risk that, in the event of a judgment in favor of Defendant, they may have been personally responsible for any costs awarded in favor of Defendant").  Thus, this factor supports a service payment to Gonzalez.

###           F.       Willingness to act as private attorney general

The Ninth Circuit observed that incentive payments may recognize a named plaintiff's "willingness to act as a private attorney general."  *Rodriguez*, 563 F.3d at 958-59.  Here, Gonzalez acted as a private attorney general, which will result in payments to the LWDA and aggrieved employees under PAGA.  (*See* Doc. 36-1 at 31, Settlement ¶ 45(c).)  Accordingly, this factor supports a service payment for the class representative.

## II.      Reasonableness of Plaintiff's request

Considering the factors set forth above—including the actions taken by Gonzalez on behalf of the class, the time expended, benefit received, risks undertaken and willingness to serve as a private attorney general—an incentive award is appropriate.  In determining the amount to be awarded, the Court may consider the actions undertaken by the class representative, the fairness of the hourly rate, and how large the incentive award is compared to the average award class members expect to receive. *See, e.g., Ontiveros v. Zamora*, 303 F.R.D 356, 366 (E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) (noting the incentive award

requested was "reasonably close to the average per class member amount to be received); *Alvarado*, 2011 WL 1883188 at \*10-11 (considering the time and financial risk undertaken by the plaintiff). Notably, a service payment of $5,000 for the class representative "is presumptively reasonable" in the Ninth Circuit. *Richardson v. THD At-Home Servs.*, 2016 WL 1366952, at \*13 (E.D. Cal. Apr. 6, 2016); *see also Gonzalez v. NCI Group, Inc.*, 2023 WL 373252, at \*9 (E.D. Cal. Jan. 24, 2023) ("Courts routinely find rewards in the amount of $5,000 to be reasonable"); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (observing that in the Northern District, "a $5,000 payment is presumptively reasonable").

### A.    Actions of the class representative

In *Rankin*, this Court approved a service payment of $5,000, where the "[p]laintiff retained counsel, assisted in the litigation, and was an active participant in the full-day mediation." *Id.*, 2011 2011 WL 13239039, at \*5. Similarly, the Northern District Court determined an incentive award of $5,000 was appropriate for a class representative "was the one who initially brought the matter to counsel's attention," participated in discovery and settlement negotiations, and "spent more than 40 hours on [the] case." *Chen v. Chase Bank USA, N.A.*, 2020 WL 3432644, at \*12 (N.D. Cal. June 30, 2020). The actions of Gonzalez—who reports interviewing counsel, assisting with discovery, and attending mediation—are similar to those taken in *Rankin* and *Chen*. Therefore, this factor supports a conclusion that the service payment requested by Gonzalez is fair and reasonable.

### B.    Fairness of the hourly rate

Previously, courts have considered the hourly rate of compensation for a class representative. *See, e.g., Ontiveros*, 303 F.R.D. at 366; *Moss v. USF Reddaway*, 2018 WL 5099291, at \*11 (C.D. Cal. Feb. 15, 2018); *Pappas v. Naked Juice Co of Glendora, Inc.*, 2014 WL 12382279, at \*14-15 (C.D. Cal. Jan. 2, 2014). In doing so, the courts declined to issue service awards where the hourly rate for the tasks completed in the action was excessive or unreasonable. *See, Ontiveros*, 303 F.R.D. at 366; *Moss*, 2018 WL 5099291, at \*11; *see also Pappas, Inc.*, 2014 WL 12382279, at \*14-15.

For example, this Court criticized a requested award that would have compensated the class representative "at a rate of $73.80 per hour." *Ontiveros*, 303 F.R.D. at 366. In evaluating the reasonableness of the award, the Court noted Ontiveros was paid $15 per hour while employed by the

1   defendant.  *Id.* at 366, n.3.  The Court explained that "[i]ncentive awards should be sufficient to

2   compensate class representatives to make up for financial risk … for example, for time they could

3   have spent at their jobs."  *Id.* at 366 (citing *Rodriguez*, 563 F.3d at 958-59.  The Court found an award

4   of "$50 per hour fairly compensate[] the named plaintiff for his time," and rounded the $13,500 total

5   up to $15,000 to "incorporate[] an extra incentive to participate in litigation."  *Id.*

6          Similarly, the Central District declined to approve service payments to the class representatives

7   where the proposed amount resulted in "extremely high hourly rates."  *Moss*, 2018 WL 5099291, at

8   *11.  The court observed the requested award of $25,000 for each of the class representatives, Moss and

9   Watkins, was "the equivalent of a payment of approximately $210 per hour to Moss and $470 per hour

10  to Watkins."  *Moss*, 2018 WL 5099291, at *11.  Therefore, the court reduced the proposed award to

11  each class representative.  *Id.*

12         Gonzalez reports that he "was paid hourly" as an employee of Xtreme but did not provide any

13  information concerning his hourly rate.  (Doc. 36-3 at 1, ¶ 4.)  The requested service payment to

14  Gonzalez—based upon the estimated 40 hours he spent on the matter—would result in an hourly rate of

15  $125.  This hourly rate is clearly excessive.  *See Ontiveros*, 303 F.R.D. at 366; *see also Pappas, Inc.*,

16  2014 WL 12382279, at *14-15 (reducing the service awards to $58 per hour for each class

17  representative).  If the Court were to adopt the $50 hourly rate approved in *Ontiveros*, the service

18  payment for Gonzalez would be reduced to $2,000.  Thus, the hourly rate does not support a service

19  payment in the amount requested.

20         **C.      Comparison of the award to those of the Class Members**

21         The Ninth Circuit indicated the Court may consider the "proportion of the [representative]

22  payment[s] relative to the settlement amount, and the size of each payment."  *In re Online DVD-*

23  *Rental Antitrust Litig.,* 779 F.3d 934, 947 (9th Cir. 2015); *see also Spann v. J.C. Penney Corp.,* 211 F.

24  Supp. 3d 1244, 1265 (C.D. Cal. 2016); *see also Emmons,* 2017 WL 749018 at *9 (E.D. Cal. Feb. 27,

25  2017) (awarding class representative payments of $8,000, 14.5 times the average award and 0.3% of

26  the gross settlement of $2.35 million); *Patel v. Trans Union, LLC,* 2018 WL 1258194, *3, 7-8 (N.D.

27  Cal. Mar. 11, 2018) (awarding enhancement payment of $10,000, which was 25 times the average

28  award and 0.125 % of the gross settlement).  For example, in *Rankin*, the Court found a service award

1   of $5,000 was reasonable, observing "the sum is reasonably close to the average per class member

2   amount to be received." *Id.*, 2011 WL 13239039, at *2.

3         The requested award for Gonzalez is more than 7 times the average award of $733.65 for Class

4   Members, and just over 2 times the highest estimated payment of $2,227.55 (*See* Doc. 35-2 at 5, Reyes

5   Decl. ¶¶ 13-14 [identifying the expected average award and the highest settlement share of $2,227.55].)

6   In addition, the requested award is approximately 1.72% of the gross settlement fund, which is nearly

7   identical to the award this Court approved in *Vasquez*, where the class representatives received service

8   payments of $5,000 out of a gross settlement fund of $300,000. *Id.*, 266 F.R.D at 490-491.  Therefore,

9   this factor supports a service payment in the amount requested.

10  **III.    Amount Awarded**

11        Because the factors discussed above support an incentive award— and the actions of Gonzalez

12  clearly benefited Class Members—a service payment is appropriate.  As noted above, the application of

13  a $50 hourly rate to the 40 hours reported by Gonzalez would result in a service payment of $2,000.

14  On the other hand, Gonzalez released his additional claims raised, and all other potential claims related

15  to his employment with Xtreme.  (*See* Doc. 36-1 at 7; *see also* Doc. 35-1 at 37, Settlement ¶ 59(c).)

16  This Court indicated that a plaintiff sacrificing "the opportunity to bring several of his own claims"

17  supported an increase to a service payment, even where it was "unclear whether those claims would

18  have had merit."  *Ontiveros*, 303 F.R.D. at 366.

19        The requested service payment of $5,000 for Gonzalez is appropriate in light of the time

20  expended, tasks taken, benefit to the class, and the sacrifice of his own claims.  *See Ontiveros*, 303

21  F.R.D. at 366; *see also Flores v. ADT LLC*, 2018 WL 6981043 (E.D. Cal. Mar. 19, 2018) (awarding

22  the "presumptively reasonable" service payment of $5,000 to a plaintiff who "contributed between 50

23  and 55 hours in assisting in the prosecution").  The Court finds the service payment is fair, reasonable,

24  and adequate.  *See Gonzalez*, 2023 WL 373252, at *9 (noting service awards of $5,000 are

25  routinely found reasonable); *see also Vasquez*, 266 F.R.D at 490-491 (finding the requested payment

26  of $5,000 was "reasonable and appropriate").  Thus, the request for a service payment to Gonzalez as

27  class representative is **GRANTED** in the amount of **$5,000.00**.

28  ///

**<u>CONCLUSION AND ORDER</u>**

Based upon the foregoing, the Court finds the class settlement is fair, adequate, and reasonable. The factors set forth under Rule 23 and Ninth Circuit precedent weigh in favor of final approval of the settlement agreement. Accordingly, the Court **ORDERS**:

1.  Plaintiff's motion for final approval of the Settlement (Doc. 35) is **GRANTED**.

2.  Certification of the Settlement Class is **GRANTED**, and the class is defined as follows:

    All current and former non-exempt California employees of Xtreme who worked at least one shift from December 4, 2016 to March 1, 2022.

3.  The PAGA award of $10,000 from the Gross Settlement Amount— including payment of **$7,500.00** to California's Labor and Workforce Development Agency, with the remainder distributed to aggrieved employees— is **APPROVED**.

4.  The request for a Class Representative service payment for Gonzalez (Doc. 36) is **GRANTED** in the amount of $**5,000.00.**

5.  Class Counsel's motion for fees in the amount of 33 1/3% of the gross settlement fund—in the total amount of **$96,666.67**— (Doc. 36) is **GRANTED**.

6.  Class Counsel's request for costs in the amount of **$12,897.03** is **GRANTED**.

7.  Settlement Administration costs in the amount of **$5,500.00**, to be paid from the gross settlement fund, are **APPROVED**.

8.  The action is **DISMISSED** with prejudice, with each side to bear its own costs and attorneys' fees except as otherwise provided by the Settlement and ordered by the Court.

9.  The Clerk of Court is **DIRECTED** to close this action.

10. The Court retains jurisdiction to consider any further applications arising out of or in connection with the Settlement.

IT IS SO ORDERED.

Dated:   **May 5, 2023**

UNITED STATES DISTRICT JUDGE